*** Filed *** 02:09 PM, 15 Jul, 2026 U.S.D.C. Eastern District of New York

Ashu Shukla
*Princeton, New Jersey*
Ashu.shukla@gmail.com
T # +1-917-488-6143

**Date: 07/15/2026**

**VIA ECF**

**Copy**:
Hon. Nicholas Garaufis (via ECF)
All Counsel of Record (via ECF)
US Department of Justice
US Treasury Office of Foreign Assets Control ("OFAC")

**Case**: **United States v. Adani**, et al, 24-cr-0433-NGG (EDNY)

## NOTICE OF APPEAL AT US COURT OF APPEALS FOR THE SECOND CIRCUIT

I respectfully submit my Notice of Appeal on Case# 07-15-25, Order# 43. Please note that I'm the <u>Whistle Blower</u> on such matters, and my filing[1] is supported by Whistle Blower Protection Laws, Provisions and Qui Tam rights. Public interests appear to have been harmed on this matter.

Before the Court are three interlinked issues – Treasury OFAC Settlement, Criminal Case Dismissal, and SEC Civil Case Settlement. In addition, a letter dated July 4th 2026 was filed by DOJ official Mr. Trent McCotter, Principal Associate Deputy Attorney General, that supports government action on these issues.

If one presents a hypothesis that the Probative value of government actions on these issues was largely governed by Adani's Pledge to invest $10 Billion in the United States and Adani's $275 Million settlement with OFAC, and the underlying issues were likely influenced by the

---

[1] Please note that Letter cited June 1st 2026 on the Order has already been withdrawn by me, and I received a confirmation on phone from the clerk that the letter was withdrawn. Motion was correctly refiled on June 24th 2026. Clerk was aware of this at all times. These filings entries do not appear on the docket 24-cr-00433. My Motion is identified as [**Exhibit A**]

involvement of deepstate / state actors in US, India and/or the Middle East, the actions proposed by the Executive however take a different meaning.

Here, the Letter submission by DOJ official fails under Bayes Theorem. Bayes Theorem is a probability-based theorem or formula that allows us to update the likelihood of an event based on prior knowledge and new evidence. It is widely used in statistics, machine learning, medicine, and decision-making under uncertainty.

The DOJ request relies on a presumed appearance that two events - monetary settlement and freedom from criminal prosecution - are events independent of one another.

The following facts contradict the DOJ official, and present a basis for a fact that parts of incoming evidence or statements by Mr. McCotter are not entirely independent of the credibility of the original indictment, but in fact are probabilistically linked by a hidden variable: the $275 Million OFAC Settlement.

Here (a) OFAC agreed to settle a related matter with the same defendants for $275 Million, (b) per agreement settlement, payout was made the payment within 14-days, and, (c) after the agreement, the DOJ decided to dismiss the case. Let us examine how the situation would hold under Bayes Theorem:

1. In real world Bayesian probability framework, the two events – a massive civil payout and a criminal dismissal – are rarely independent.

2. Translating this legal standoff into a Bayesian probability landscape: Start with definitions:

    a. **The Main Probability Set (The Hypothesis (H)):** The indictment is legally sound and meritorious ($H_1$ = {Guilty/Valid Case} **vs.** legally unsound $H_0$ = {Innocent/Flawed

Case}) [2]. Bayesian statistics requires a **Prior**—an initial mathematical statement of your belief before seeing data

**H$_1$ = {Guilty/Valid Case}**

1. The indictment is meritorious.
2. *Prior:* P(H$_1$) = approx. 91.4% (Based on Federal conviction rates)

**H$_0$ = {Innocent/Flawed Case}**

1. The indictment is legally unsound.
2. Prior: P(H$_0$) = approx. 8.6% (this is the "Posterior Probability of Innocence."

(This is what the defense is trying to maximize)

b. **The Conditional Probability Sets:**

**P (Indictment | Innocent):**

1. The probability that an innocent person gets indicted. This number is incredibly small, rare for an innocent to get indicted

**P (Innocent | Indictment):**

1. The probability that a person who has *already* been indicted is innocent

c. **The Conditional Probability Sets (Bayesian):**

---

[2] As we are aware, the base-rate prior for a Federal indictment is high because DOJ spends months or years building a case *before* going to a Grand Jury, they are highly selective and only bring charges when victory is nearly guaranteed. (the Likelihood of an indictment being issued against an innocent person is historically extremely low)

However, every case must be evaluated entirely on its own unique data layout, independent of the overarching historical base rates

3

| **Conditional Probability Set ($I_1$) (Favorable Rationale – Case Serves no Federal Interests):** | **Conditional Probability Set ($I_2$) (Unfavorable Rationale – Letter is Covering a Political Deal):** |
|---|---|
| 1. DOJ official McCotter's letter is <u>truthful</u>, and the charges are legitimately legally unviable, extra-jurisdictional, or counter to national interests.<br>2. Likelihood: P(Letter \| $H_0$). | 1. DOJ official McCotter's letter is an executive <u>obfuscation</u> (lying/spinning) meant to cover up political interference, improper deals regarding promised domestic investments, or a rogue policy shift.<br>2. Likelihood: P(Letter \| $H_1$). |

    d. **Expected Value of Sample Information (EVSI)** measures how much a new piece of data reduces uncertainty and prevents a wrong decision. Here, we calculcate EVSI = (E(Utility(Decision with the Letter) – E(Utility(Decision without the Letter))

3. Here, the \$275 million payment to the Treasury can be identified as a "**Purchase of Good Faith**". Consider the following <u>**two**</u> scenarios:

| <u>Scenario 1</u> | <u>Scenario 2</u> |
|---|---|
| **Description**: \$275 Million Payout agreement and the Dismissal | **Description**: Defendants make the Payment, Third Party intervenes, Payment but no Dismissal is followed by McCotter's Letter |
| 1. **Evidence A (The Payout) ($E_{A1}$):** Adani pays \$275M for Iran sanctions violations (a "real" crime with clear US jurisdiction). | 1. **Evidence A (The Payout but no Dismissal) ($E_{A2}$):** Adani pays \$275M for Iran sanctions violations (a "real" crime with clear US jurisdiction). Done deal. |

1. Here we must also state **Certainty** ($P(\mathbf{E_A}) > 0.9$) as the wire transfer was agreed upon on May 14th 2026, and is set to clear within 14-days

2. **Evidence B (The Dismissal) ($\mathbf{E_{B1}}$):** DOJ drops the bribery/fraud case (chooses not to dedicate further resources).

3. **The Dependency: Set** $P(\{Dismissal\} \mid \{Payout\}) > P(\{Dismissal\})$. The government is banking on the OFAC settlement (monetary payment) to tie different components of the case independent of one another under what can be identified as a **Global Resolution Strategy** (but without explicitly stating so) to dismiss the case

4. **Analysis:** The probability of a "with prejudice" dismissal for a standard indictment is approx. 8.2%. However, here the probability of dismissal *given* a $275M payout agreement approaches 100%.

5. **Implications**: Per OFAC Enforcement Release, Adani was to wire the Money to OFAC within 14-days (by the end of May 2026). Here, the moment the Treasury accepted the $275 million offer, the executive branch secured its public relations and financial victory. The <u>political risk</u> of dropping the criminal case plummeted to zero.

a. Here we must also state **Certainty** ($P(\mathbf{E_{A2}}) = 1.0$) as the wire transfer has cleared.

2. **Evidence B (The DOJ Letter seeking Dismissal) ($\mathbf{L_{DOJ}}$):** DOJ justifies their drop by identifying the case as "flawed" bribery/fraud case (a "weak" crime with poor jurisdiction)

3. **The Dependency:** $P(\{\mathbf{L_{DOJ}}\} \mid \{\mathbf{E_{A2}}\}) > P(\{\mathbf{L_{DOJ}}\})$. The government is banking on the OFAC settlement to provide the necessary **political cover to survive** dropping a high-profile indictment

4. **Analysis:** Conditional Probability $P(Letter \mid Payout)$ must be used to examine why did McCotter write the letter?

   a. Under **($\mathbf{I_1}$)** (Favorable Rationale – Case Serves no Federal Interests): McCotter claims he dismissed the case and subsequently wrote the letter because the case is weak.

   b. Under **($\mathbf{I_2}$)** (Unfavorable Rationale – Dismissal is Covering a Political Deal)**:** McCotter dismissed the case and subsequently wrote the letter because the $275M was already "banked," and the DOJ *must* now deliver the "<u>product</u>" (the dismissal) to <u>close</u> the transaction.

| | 5. **Implication**: Post settlement, mathematically, the probability that McCotter would file a letter or motion further supporting dismissal <u>skyrocketed</u> the exact moment that wire transfer cleared. The data was locked in; McCotter's letter was merely the <u>administrative paperwork</u> required to <u>legitimize</u> a transaction that had already been executed. |
|---|---|

6. Please note that my Motion dated June 24th 2026 was served to DOJ official Trent McCotter, Principal Associate Deputy Attorney General, <u>via email</u>, and I even received an acknowledgement from him (see below snapshot of ack. by Mr. McCotter)



**Automatic reply: [EXTERNAL] Fwd: 24-cr-00433 US vs Adani Motion Filing**
1 message

McCotter, Trent (ODAG) <Trent.McCotter@usdoj.gov>          Mon, Jun 29, 2026 at 10:33 PM
To: Ashu Shukla <ashu.shukla@gmail.com>

I am out sick today, hope to be back soon.

7. The introduction of the **$275 Million Payout** and the subsequent **Dismissal** create a massive divergence between "Legal Truth" and "Bayesian Truth". Consider the **Bayesian Update on the above identified two scenarios:**

| <u>Scenario 1</u> | <u>Scenario 2</u> |
|---|---|
| | |

| | |
|---|---|
| **Presented by DOJ as Legal Truth:** DOJ has reviewed the cases and chosen not to dedicate further resources against individual defendants | **Presented by DOJ as Legal Truth:** McCotter's letter supports the dismissal, cites national security directive, identifies that the case was defectively charged, argues demand for detailed dismissal rationales are unconstitutional and harmful |
| **However, the <u>Bayesian Reality</u>:**<br><br>1. The payout agreement $(E_{A1})$ collapses the probability distribution. The "political risk" of dropping the case $(H_1)$ (indictment is meritorious) was offset by the financial victory $(E_{A1})$<br><br>2. Therefore, the Dismissal $(E_{B1})$ is no longer a variable outcome; it is a **deterministic consequence** of $(E_{A1})$<br><br>3. Posterior probability identifies the probability that *these specific defendants* are factually innocent, given they were indicted and then the case was dismissed.<br>    a. Normally, a dismisaal with prejudice would skyrocket the probability that a person who has already been indicted is innocent P (Innocent \| Indictment) to 100%. However, $275 Million payment acts as "Evidence" that drags the probability of factual innocence down. | **However, the <u>Bayesian Reality</u>:**<br><br>1. Because the payout $(E_{A2})$ occurred *before* McCotter's letter, the probability of the letter being generated is near-certain P(1). The DOJ cannot both keep the money and *not* write the letter (to dismiss the matter).<br><br>2. Here, the efficiency matrix ((Political Cover).(Scrutiny)) based on McCotter Letter becomes important. By citing "National Interests" (mirroring the OFAC/National Security settlement), the McCotter letter attempts to maximize efficiency. However, the <u>intervention</u> as a function of political cover lowers the efficiency. It forces the observer to compare the <u>timing</u> of $E_{A2}$ and $L_{DOJ}$<br><br>3. By mapping the $275M payment as a fixed antecedent variable (Event A (Payout) happened *before* Event B (Dismissal)), the likelihood $I_2$ (Objuscation / deal) are the dominant hypothesis<br><br>4. Fact that the dismissal (and the DOJ letter justifying it) occurred strictly **conditional on the** |

| | |
|---|---|
| b. The $275M payment satisfied the Executive's <u>utility function</u>, making the criminal trial redundant.<br><br>4. If $I_1$ (Truth) were the driver, the dismissal <u>could have happened</u> at <u>any time</u>. However, the dismissal as a deterministic consequence <u>occurred only after</u> the payout agreement. | **payout** $P(L_{DOJ} \mid E_{A2})$ indicates that the letter is merely the <u>administrative validation</u> of a <u>financial transaction</u> that has already been settled. |

5. **Bayesian Reality** confirms that the "**Purchase of Good Faith**" was the <u>true causal mechanism</u>. The payment didn't prove innocence; it rendered the question of **innocence** financially irrelevant to the Executive Branch.

6. Here, one can infer that:
    a. A defendant's **willingness to pay** a massive settlement shifts the Executive branch's utility calculation.
    b. The Executive branch (DOJ/OFAC) view financial enforcement as a tool for **Policy Execution, Risk management, and State Revenue**.

7. Additionally, one can infer that the **interests** of the defendants were aligned with the interests of the US Executive Branch. Defendants were **willing to pay** a massive settlement to dismiss the case, and Executive Branch **desired to look good** before the US Public under the guise of generating State Revenue.

8. Thus, one must <u>scrutinize</u> the $275 Million Payment which served the Executive's utility function of dismissing a criminal indictment, <u>and</u> the "Purchase of Good Faith" as a Political Cover to disproportionately influence decision making, <u>given</u> defendant's willingness to dismiss the case, and Executive branch's desire to <u>look good</u> before the US Pubic, through a Bayesian lens (which also involves Executive invoking US National interests):

    a.  Since National Security Interests [3] can be harder to challenge in independent rule-of-law proceedings, Leaders and Deepstate actors often use such Policy as a tool to promote their Political and Personal interests.

    b.  Policy idea comes from the fact that the resolution of such issues may be negotiated at a level above individual enforcement agencies.

9.  The **"Blanche Memorandum"** <u>Alignment</u>**:** DOJ official McCotter relies heavily on the "Blanche Memorandum," which orders prosecutors to weigh "national security interests."

    a.  Here, the OFAC settlement specifically resolved **Iran sanctions violations** (a core national security threat).

    b.  By resolving the Iran threat via the civil settlement, the DOJ actively <u>manufactured</u> the <u>legal reality</u> Trump administration (and McCotter) needed to claim the remaining bribery charges were "<u>low priority</u>". The **settlement** created the very **pretext** the letter uses.

    c.  Per Blanche Memorandum, the Executive has a formal "Executive Veto" over the law. Even if a target is factually guilty (Judicial Truth), the Executive can—and now *must*—

---

[3] When National Security is invoked, the cause and effect become material:

1.  Deepstate actors know that using the national security clause fundamentally changes the narrative. Instead of the Judge and the Jury, DOJ Prosecutors & National Security Council effectively become the Arbiter of Fact.

2.  Deepstate actors know that instead of Full Discovery & Confrontation, the defense is left with Limited or No Rights under State Secrets/CIPA. Target individuals cannot effectively litigate their innocence because the invocation of "National Security" triggers the State Secrets Privilege and the Political Question Doctrine, legal mechanisms that force the Judiciary to defer to the Executive branch.

3.  Deepstate actors effectively use the settlement as the only available off-ramp to convert their status from "Existential Threat" to "Managed Partner".

4.  Deepstate actors know that as the Judiciary defers to the Executive branch, the court effectively "abdicates" its oversight role

For instance, one such usage of National Security clause is the <u>Blanche Memorandum</u> which codifies this by instructing prosecutors to filter Foreign Corrupt Practices Act (<u>FCPA</u>) cases through the lens of "<u>US strategic interests</u>" and "<u>economic competitiveness</u>".

bypass prosecution if the target is deemed a "Strategic Asset" (Executive Utility). The question of <u>guilt</u> is <u>rendered secondary</u> to the question of **strategic value.**

10. Blanche Memorandum creates a <u>Filter</u> based on "National Interests", a filter on court cases <u>before</u> a case reaches the court where a Judge can review a filed charge, but they *cannot* review a decision *not* to charge.

    a. DOJ's administrative finality: At <u>inception</u>, the "truth" of the target's status is decided in a closed-door meeting at the DOJ (<u>Executive</u> Branch) based on <u>intelligence</u> and/or <u>economic data</u>, rather than in a courtroom based on evidence

11. Under Bayesian, the Blanche Memorandum confirms that the "**Purchase of Good Faith**" is the **intended system** where the DOJ successfully transitions from being a prosecutor of crime, to becoming a regulator of **loyalty and risk:**

    a. An intended system where **Guilt** becomes a risk factor to be managed, concept of **Enforcement** becomes a discretionary tool for US Interests, and a **Settlement** is a validation for strategic alignment (Good faith).

    b. An intended system that promotes Conversion to a U.S.-aligned entity: The payment verifies that the entity is now a controlled instrument of U.S. economic statecraft, and that the DOJ will **<u>shield them</u>** from the rigid application of the law that an outsider would face.

    c. An intended system where an **innocent** entity that refuses to pay/settle is "**uncontrolled**." But a **guilty** entity that pays and submits to monitoring is "**controlled**." To the Executive, the **controlled** entity **is safer** than the innocent one.

    d. An intended system that promotes **incongruent** administrative finality: During the course of an existing or ongoing action, the "**truth**" of the target's status is decided in a closed-door meeting at the DOJ (Executive Branch), based on **economic value** and/or **state revenue**, rather than in a courtroom based on evidence and cross-examination.

12. Since the hypothesis, when viewed through a Bayesian lens, provides a highly compelling model for understanding the functional reality of modern executive enforcement, one can easily question the <u>validity</u> of the Letter presented by the DOJ official:

a. Blanche Memorandum formalizes a shift from an **act-based punitive model** (traditional justice) to an **actor-based risk model** (statecraft)

b. The adversarial process is replaced by an administrative <u>transaction</u>, and the **settlement** created the very **pretext** the letter uses

c. The hypothesis describes a system, as identified by the DOJ official on his letter, that has **evolved** beyond the traditional boundaries of criminal law. The letter identifies a state where Blanche Memorandum serves as the final codification of a system where Executives use enforcement as a regulatory dial to manage risk, command loyalty and protect political interests on the name of national security.

13. More importantly, since US deepstate and Indian female state actors have continued to misuse this **actor-based risk model** (statecraft) on multiple instances or occasions against me, the court must ensure criminal charges are pressed upon such involved actors followed by their prosecution.

a. These actors are <u>banking</u> on the fact that their fate has already been determined in closed-door DOJ meetings based on economic utility, and the **constitutional courtroom** has already **been rendered obsolete**. That the Judiciary is presented with a pre-packaged settlement that it has almost no legal mechanism or political appetite to reject

b. In fact, recent DOJ / court actions have encouraged and emboldened these state actors to enhance their targeted retaliatory attacks against me. They coordinated with a neighbor to illegally construct a large & lengthy wall deep into my personal property (land at Prime Lakeside Location), and targeted my internet to manipulate the Police filing system so I would not be able to file FIR [4] into the Public System. Then they subsequently coordinated with other involved persons and central government agencies to retaliate on related issues or matters.

c. Regardless of their motivations and actions, the Judiciary must continue to prioritize on **doctrinal consistency, individual due process,** and **absolute truth**

---

[4] Evidence and Pictures would be provided in my Motion to Intervene.

14. Interestingly, post letter by DOJ and around the time Judge entered his order dated July 8th 2026 [5], **US President Trump** desperately discredited Iran, called Iranian leaders as **scums**, declared fragile ceasefire and MOU over.

   a. Similarly, in January, Elon Musk, Musk said that Anthropic's "fate is to be misanthropic" and the following month, he accused the company of stealing training data "at massive scale" and called it "**smug**, **sanctimonious** and **hypocritical**". (*id*)

   b. Later that month, he wrote that "Anthropic **hates Western Civilization**." In March, he asked, "Is there a **more hypocritical** company than Anthropic?" and called Claude "woke," alleging that the company's AI models are trained to have a left-wing bias, according to the news publication. (*id*)

   c. Musk's **change of heart** about Anthropic came prior to SpacceX IPO when the two companies announced a deal that would give Anthropic access to compute capacity from SpaceX's Colossus 1 data center.

   d. Here, by invoking "**National Security**", and then discrediting and targeting Iran, it appears that Trump is trying to ensure that Iran cannot prove their non-involvement. Is Trump personally aware that the Trump administration used Iranian LPG trade as a ruse and subterfuge to secure Judicial immunity on Adani's criminal actions, or are his colleagues advising him so?

15. Given the $275 Million settlement with OFAC, and the fact that Government of Iran owns Oil and Gas in Iran, and based on research, there is no direct Iranian government record, statement or acknowledgment of LPG transaction with Adani, such actions "equip a distant observer to raise questions":

   a. Why would Iranian Government bother to sell such small quantities of LPG to Adani? Monthly approx. $5-7 Million of LPG over a period of little under 2-years?

   b. Is US President concerned that Iran or Iranian administration may possibly expose them [6]?

---

[5] Based on multiple experiences, Deepstate actors plan such scenarios beforehand. Recently Indian female state actors coordinated with a neighbor to illegally construct wall on my property next to Lake area.

[6] Trump administration and state actors appear to be terrified of the fact that Iran or any other involved person or Government officials from the Middle East may come forward and support my Motion, and possibly prove Iran did not supply LPG to Adani

      i. Just like Elon Musk, should one expect change of heart from Donald Trump on Iran as soon as the Judicial Threat over him disappears?

c. Is the Trump administration misusing national security interests as a means to justify their Political agenda?

      i. Did the US use its Primary Sanctions Enforcement unit to process Political Fabrications?

      ii. Should international banks continue to trust the neutrality of U.S. financial clearing systems (Global Financial System led by the US), or loose confidence?

d. Does the case identify primary systemic failure, identifying structural erosion of US legal and regulatory authority?

      i. Will the Executive branch continue to support collaborators? Or will usurping the courts to protect foreign cronies lead to a constitutional crisis?

      ii. Did one or two nations with exposed or fragile banking systems help US to maintain or safeguard its financial leverage, dominance through a sanction-based regime?

e. Since Adani declared $10 Billion in investments to the US, is the Trump administration certain that defendant Adani would deny questions raised by the Judge, and would do anything to support their internal scheme?

      i. Did the illicit collusion provide foreign corporate entities and their host governments immense leverage over US officials, creating ongoing blackmail vulnerabilities?

f. Does the Whistleblower have sufficient basis to establish Probable Cause on the matter, or sufficient basis to establish Probable Cause on the matter of collusion?

      i. Will deepstate continue to protect Indian female state actors, and will their crimes go un-litigated and unhindered?

ii. Will becoming allied to or partnering with the United States and US Government offer a free-pass to continue corrupt or unethical practices?

1. Using a settlement to dismiss bribery charges effectively legalizes foreign corruption on US soil. It signals that US laws like the FCPA do not apply to "strategic assets," encouraging other allies to demand similar immunity

16. **Analyzing the Conditional Probability Set ($I_1$) (Favorable Rationale)** that DOJ official McCotter's letter is truthful, and the charges are legitimately legally unviable, extra-jurisdictional, or counter to national interests. Under this hypothesis, the charges really were indefensible (no jurisdiction, "puffery," no victims, etc). However, the DOJ faced a political problem: they couldn't just drop the case without looking weak on corporate crime:

   a. **Fit:** The OFAC settlement provided the necessary **political cover**. It allowed the US government to claim a massive victory ($275M and compliance reforms) on a legitimate national security issue (Iran sanctions).
   b. **Logic:** "We nailed them on the *real* threat (Iran), so we can now quietly dispose of the *bad* case (Bribery) that we were going to lose anyway."
   c. **Efficiency [7]:** High. The government saves face and resources.

17. **Analyzing the Conditional Probability Set ($I_2$) (Unfavorable Rationale):** DOJ official McCotter's letter is an executive obfuscation (lying/spinning) meant to cover up political interference, improper deals regarding promised domestic investments, or a rogue policy shift. Under this hypothesis, the dismissal was not solely based on legal merits, but was likely a part of a negotiated quid pro quo. The $275 million was the "price" of the dismissal.

   a. **Fit:** The probability of these two massive events happening almost simultaneously by chance is astronomically low. The settlement acts as the **explanatory variable** for the *timing*.
      i. *Why dismiss now?* Because the check cleared.

---

[7] Efficiency= {Information Gain (Uncertainty Reduced)} / {System Cost (Time, Resources, Institutional Friction)}

      ii. *Why dismiss with prejudice?* Because that was a condition of the payment.

    b. **Logic 1:** OFAC settlement is based on "National Security Issue' (Iran Sanctions). However, McCotter Leans on Blanche Memorandum (which directs prosecutors to focus on national interests) for dismissal. If Adani Group is violating national interests on the basis of Iran sanctions, then McCotter's claim that the case didn't implicate national security <u>cannot be true</u>. In fact, it can be argued that McCotter incorrectly identifies that the case (a) did not have any effect on U.S. companies, (b) did not in any way implicate national security.

    c. **Logic 2:** By settling the Iran issue separately, the DOJ artificially <u>removed</u> the "national security" <u>tag</u> from the file, allowing McCotter to claim the remaining bribery charges were "low interest." [8]

18. **The Bayesian Verdict:** When you remove the Naive Bayes independence assumption, which assumes that all pieces of incoming evidence are entirely independent of one another:

    a. **I1 (Merit of McCotter's Letter)** loses probability because the **<u>timing</u>** becomes suspicious. If the case was legally flawed a year ago, why wait until the *exact week* of the $275M settlement to drop it? The <u>sequence</u> and <u>timing</u> of events simply do not support McCotter's position on dismissal. Similarly, since the DOJ officials never acted alone, their involvement stays material. They were aware of and involved in the OFAC resolution and SEC matter.

    b. **I2 (Obfuscation on McCotter's Letter)** gains massive probability. The settlement explains the "Why Now?" question, and suggests McCotter's "Non-Considerations" paragraph is a specific, calculated draft designed to <u>decouple</u> the two events on the public record.

---

[8] McCotter started as DOJ Principal Associate Deputy Attorney General in April 2026. With his letter, he is <u>practically</u> undermining the authority of his immediate predecessors from years 2024 – 2026 or earlier

    c. **DOJ is avoiding Judicial Oversight**: Since **I2** is the dominant probability, it strongly suggests the DOJ is "laundering" a plea deal by splitting it into a Civil Settlement (for the money) and a Criminal Dismissal (for the freedom), avoiding the judicial oversight that comes with a formal Plea Agreement

    d. **Coincidental timing** renders the Non-Considerations claim identified on the McCotter letter as statistically improbable

19. In light of the OFAC settlement, it can be argued that the DOJ and defendants reached an agreement (explicit or tacit) (with members of the Trump administration) to have the criminal case dismissed. It can be further argued that subsequently, to keep their arrangement contained and deniable, DOJ official McCotter engaged in a unusual solo authorship and did not involve career prosecutors.

20. **$10 Billion investment** interest in the United States were publicly and expressly indicated earlier. Given the fact that investment considerations always remained **live** (or live in the room), DOJ official McCotter has failed to offer any proof that they played no role.

21. Here is how the "Purchase of Good Faith" (Scenario 1 & 2) mathematically alters your two core probability sets concerning the indictment itself.

    a. **The Logic of the Payment:** Truly innocent defendants (who McCotter claims were just using "puffery") rarely pay quarter-billion-dollar fines to the US Treasury.

    b. **The "Implicit Confession":** By paying for the "Iran Sanctions" violation $(\mathbf{E_A})$ to secure the dismissal of the "Bribery" case $(\mathbf{E_B})$, the defendant signals they were willing to incur a massive penalty to avoid the risk of trial. In Bayesian game theory, this behavior correlates highly with **Liability Minimization**, not **Factual Innocence**.

    c. **The Result:** While one may choose to identify the defendants as now **Legally Innocent** per settlement agreement and $\mathbf{L_{DOJ}}$, their **Bayesian Factual Innocence** drops significantly. The model views the dismissal not as a "finding of innocence," but as a "purchased service."

22. **Conclusion**:

a. Here, Bayesian Reality confirms that the "**Purchase of Good Faith**" was the true causal mechanism. The payment didn't prove innocence; it rendered the question of innocence financially irrelevant to the Executive Branch.

b. The system allowed a valid indictment ($H_1$) to be "**purchased**" or "**bought out**" via a civil channel ($I_2$ (obfuscation)). If the Court dismisses the case based on DOJ Official McCotter's Letter, the entire Process of DOJ led Criminal Indictment, Arrest and Prosecution becomes questionable.

c. This would in-turn provide a massive **victory** to US deepstate and Indian female state actors who continue their retaliatory acts against me, and would **embolden** their belief that a civil settlement on the matter would exonerate them from criminal prosecution.

Thank you for your time and consideration on this matter.

**Date: 07/15/2026**

**/s/ ashu shukla**

**Ashu Shukla**
202 Salem Ct, Apt# 11,
Princeton, NJ 08540
ashu.shukla@gmail.com
T # +1-917-488-6143

**Post Script**:

23. **Outstanding Questions**: Did the Trump administration officials, OFAC, and/or the defendants actively collude to engineer a fraudulent $275M settlement as a vehicle for dismissing the criminal case in exchange for U.S. investment commitments? [9]

a. In the matter of Public interests, the I believe the following questions must be sufficiently addressed:

---

[9] If Whistleblower's collusion theory is true, then McCotter's letter should be re-read by the court not as a neutral prosecutorial account, but as a document containing several passages that are *directly probative of the very collusion being alleged*, some of which arguably corroborate it and others of which look like a scripted denial.

   i.  Did US work with allies (intermediaries in UAE, Oman) to engineer a fake Iranian Origin LPG trail?

  ii.  Will be US administration be able to sufficiently prove that the LPG was of Iranian origin, and not of Bahrain, Iraq, Oman, Kuwait or Qatar Origin? How about Syria or Venezuela?

  iii.  OFAC actions are insufficient to establish probative cause:

     1.  Pattern: OFAC failed to articulate and account that Tanker pattern anomalies are fairly common in the Persian Gulf

     2.  Flagging: OFAC was aware that Vessels legitimately loading Omani / Iraqi cargo incorrectly get flagged by pattern matching anyway, but continued their biased investigation so they could secure large settlement from a motivated defendant and also secure Political victory?

     3.  Person: Dubai Trader & the transactional specificity of his actions (falsifying certificates of origin) identified by the OFAC altogether are no different than the actions of Persons leveraged or used by Indian female state actors on matters identified by me?

     4.  Mechanisms: Lack of Single Source of Truth or standardized mechanisms allowed the agency to speculate? (No single authority on information templates, data tracking or reporting allowed OFAC to speculate?)

  iv.  Did US, allies and Trump Executives work to leverage the settlement as a tool to convert Adani into an Allied / Managed Partner?

   v.  Is the Payout itself a negotiated political resolution rather than an admission of underlying fact?

  vi.  Are the Trump Executives banking on the fact that Iranian state entities would stay as silent about a real illicit sale, as they would stay silent about a fabricated one; and such non-acknowledgement carries zero diagnostic value?



EXHIBIT A

**Ashu Shukla**
*Princeton, New Jersey*
ashu.shukla@gmail.com
T # +1-917-488-6143

**Date: 06/24/2026**

**VIA ECF**

**To,**

**Hon. Nicholas Garaufis,**
United States District Court,
Eastern District of New York,
225 Cadman Plaza East,
Brooklyn, New York 11201

**Copy**:
All Counsel of Record (via ECF)
US Department of Justice
US Treasury Office of Foreign Assets Control ("OFAC")

**Case**: **United States v. Adani**, et al, 24-cr-0433-NGG (EDNY)

**Re**: **Letter Motion requesting Leave of Court to file Motion to Intervene within 14-days**

**Respected Judge Garaufis,**

I respectfully submit my Letter Motion requesting Leave of Court to file my Motion to Intervene.

Based on my analysis and position that the OFAC enforcement action was fabricated, pretextual, or legally invalid. I retain the right to sue the US Government, US OFAC, US DOJ and other agencies or parties, and demand $275 Million in damages.

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

To begin with, I must identify that none of the defendants identified on the matter 24-cr-00433, except for Mr. Gautam Adani, are related or relevant to this filing.

The matter (24-cr-00433) was originally filed in October 24th 2024 under the Biden administration, after Ex-President Biden choose not to contest and the democrats lost US Presidential election.

No where in the indictment has the US Department of Justice (US DOJ) or any other agency identified matters related to Adani Group's Shipping or Ports business. However, the US Government deliberately chose to secretly increase the "**Scope**" of the matter without informing the court, subsequently entered into a settlement agreement with the defendants to the tune of $275 Million, and then **conveniently** filed a Motion to dismiss the matter.

Then the defendants followed and filed a letter on related matter (24-cv-08080) identifying that the court has "very little authority" to deny DOJ's motion under Rule 48(a). Had the defense counsel sought permission from this court on the OFAC settlement and not settled the matter directly with the OFAC, or had the defendants not identified the OFAC action as related on their own letter (*doc# 40*), one could have argued that the court indeed had "very little authority" to deny DOJ's motion under Rule 48(a).

Upon knowledge and belief, while challenging the US DOJ on extraterritorial grounds, Adani Group leaned into an "extensive cooperation" posture with the Treasury (OFAC), proactively providing audit findings to swap the risk of a criminal sanction(s) prosecution for a purely financial civil settlement [1].

Had the DOJ not relied on the OFAC settlement to dismiss the matter, one could have argued otherwise. In this filing, I identify why the court must instead grant me Leave of Court to file a Motion to intervene.

---

[1] Source: Politico dated May 18th 2026. Economic Times dated May 19th 2026.

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

In a previous court filing, I have identified that the United States had stolen my Model which has led to a market driven AI boom in the United States. Essentially, among other things, I referenced a Publicly available Paper titled "Attention is all you need" by Google Engineers from year 2017 for parts of my model.

My model relies on the concept of "forward passes" used in popular games like American Football (NFL) or Rugby.

Later on, Persons at Google who were involved in the Paper "Attention is all you need" helped create another AI model. This AI model powers AlphaFold, Google Deepmind's AI system that predicts protein structures from their amino acid sequences.

This research in Protein structure prediction led to Nobel Prize in Chemistry for Year 2024. The AlphaFold Model is not rocket science, and is based on the simple concept of "covariance" [2].

In Alphafold, when two amino acid residues are physically in contact in a protein, mutations in one are co-selected with compensatory mutations in the other to preserve the structure – a phenomenon known as co-evolution or covariation.

In AphlaFold, the Model aligns hundreds of thousands of evolutionary related amino-acid sequences in a matrix, and identifies it as Multiple Sequence Alignment (MSA). Combined with Pairwise residue representations (within a single protein), a Transformer function extracts the covariance structure of the MSA matrix to identify which Pairs of residues co-mutate, and therefore which pairs are spatially proximal in 3D. Similarly, which Pair of amino-acid positions are most correlated in their evolutionary variation can also be identified.

---

[2] Covariance is a measure of joint variability of two random variables. It measures whether two things move together or against each other.

Post attest warrant issued by the Judge on the matter, imagine Indian female state actor Woman running at considerable speed, do her breasts move together in sequence or against each other can be measured by co-variance.

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

The concept multi-dimension (3D [3]) analysis is relevant. MRI performs multiple 2D multi-slice image acquisitions of particular organ or area, and uses advanced reconstruction algorithms like Fourier Transforms, iterative reconstruction and compressed sensing to process such signals or 2D images into a clear 3D Model [4].

Now, here, we use multi-layered covariance analysis similar to Alphafold's method as a forensic analytical model and apply it on this matter.

In this particular matter, the invested US deepstate actors who copied my Capital Creation Model without my permission, and subsequently applied my model to AI companies to generate Trillions of dollars of wealth within the United States, also appear to have coordinated with US Treasury OFAC to maintain double standards [5].

Without understanding my model or its complexity in its entirety, they failed to take the necessary steps to ensure that I would not catch them.

Here, I first cover the fact that a simple <u>statistical analysis</u> undermines the entire narrative of $275 Million Adani settlement with OFAC. Subsequently, I present the <u>Human connection</u> and identify why the Courts must hold US Government, US Treasury OFAC accountable, and why OFAC should be penalized.

---

[3] Millions of intricate 3D protein structures have been revealed through such methodology, and is helping scientists understand how all life's molecules interact (See: deepmind.google)

[4] In my Motion to intervene, through the use of such 3D Models or Techniques which provide (a) clarity of depth, (b) relief from occlusion (preserve data behind the foreground), and (c) relief from lightening or material distortion (based on angle of viewer and light source, shadows, highlights and reflections change completely), I will further present why the OFAC enforcement action is fabricated, pretextual, or legally invalid.

[5] The question how Deepstate actors are involved and whether they have "arranged" for a settlement will be addressed on my Motion to Intervene

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

### I. Simple Statistical analysis undermines the Settlement Narrative:

Here, the following well known analytical methods will help explain the matter further:

| S. No. | Method | Context |
|---|---|---|
| 1. | Variance | Where do the stated facts deviate anomalously from regulatory norms or expected enforcement patterns? |
| 2. | Covariance | Which facts co-move suspiciously, or fail to co-move when they should? |
| 3. | Correlation | What is the causal correlation between AEL's conduct and the penalty, and does it hold up statistically and legally? |
| 4. | Standard deviation / outliers | Is this enforcement action consistent with comparable actions or are there any outliers? |
| 5. | Confidence scoring (pLDDT analog) | Which stated findings carry high evidentiary confidence, and which are speculative or conclusory? |

OFAC's AEL enforcement release dated May 18th 2026 is provided as [**Exhibit A**].

OFAC maintains a list of Specially Designated Nationals (SDNs) and Blocked Persons (the "SDN List"). AEL conducted its standard know your customer (KYC) verification process on the identified Dubai Supplier and its affiliated involved in LPG Sales, and cleared them against OFAC.

OFAC on their attached settlement / enforcement release alleges that the Dubai supplier served as a conduit for illicit Iranian supply to enter the market. Yet OFAC has failed to sanction them.

Here, three non-matching events appear to have occurred simultaneously. First, no criminal referral by OFAC to DOJ despite "egregious" classification, and no OFAC sanctions against AEL's Dubai Supplier despite Third Party deception, falsified paperwork, etc. Second, the defendants agreed to settle the matter for $275 Million. Third, DOJ relied heavily on OFAC

5

settlement to dismiss their own criminal indictment against Adani. This led us to further investigate the matter.

**First**, Standard OFAC compliance requires SDN screening of direct counterparties, not non-public corporate genealogy of unnamed affiliates. Nowhere has the OFAC stated that AEL was required to conduct affiliate-of-affiliate OFAC screening.

1. OFAC notes that an affiliate of the Dubai Supplier was designated in March 2023 under E.O. 13846. AEL's first trade was in November 2023 — eight months later. Yet OFAC states "it does not appear that AEL was aware of the designation at the time".

2. If OFAC's own SDN List did not link the Dubai Supplier to the designated affiliate in any searchable way, AEL's KYC clean result was not negligent — it was the expected output of a properly functioning compliance program. OFAC's document does not allege that the Dubai Supplier itself was ever designated during the violative period.

US sanctions and monitoring on such matters is immediate. Not 18 months or years after the fact as identified on the US OFAC enforcement release.

1. Here, OFAC launched investigation on the matter only after public reports in June 2025 or later. The **covariance** between "sanctions liability" and "enforcement action" is weak under the statute.

**Second**, Per OFAC, "egregious" typically requires willful conduct or SDN-touching activity. On their enforcement release, OFAC has noted that AEL relied on OFAC sanction compliance program.

1. OFAC simultaneously noted (a) no SDN-listed parties were directly involved, (b) no AEL documentation explicitly showed Iranian origin, (c) AEL conducted standard KYC, (d) the Dubai Supplier passed all SDN screenings. The <u>coexistence</u> of OFAC's "<u>egregious</u>" classification with the <u>complete absence</u> of direct SDN contact provides a <u>high-variance anomaly</u> with no real or legal precedent.

2. Applying a confidence scoring mechanism, similar to pLDDT (0-100) Analog, no willfulness finding based on no SDN Contact, no criminal referral translates into a **Low**

**confidence score** of 20-30% that the OFAC correctly classified the matter. The matter should not have been classified as "egregious".

**Third**, AEL processed $192,104,044 in Iran-related USD payments over 32 shipments. OFAC imposed a $275,000,000 settlement. The statutory maximum for settlements was set at $384,208,088, which itself equals exactly 2-times the transaction amount.

Here, OFAC settlement identifies a 143.2% penalty-to-underlying-transaction ratio. However, for first time violators, OFAC penalty-to-transaction ratios rarely exceed 50–80%. (See comparable non-voluntary disclosure, egregious OFAC cases (e.g., ZTE, Vitol)).

The **variance** from OFAC Historical norms is ~3–4 standard deviations from historical OFAC settlements for similarly situated non-U.S. entities, raises the **question of intent** [6].

**Fourth**, OFAC's enforcement framework for Iran sanctions (ITSR § Part 560 (Iranian transactions and sanctions regulations), also see subpart 203(a)), does not impose a duty of maritime intelligence on cargo buyers.

1. Here, OFAC's own document reveals a critical **negative covariance**: the very red flags cited -- AIS manipulation, vessel name changes, falsified certificates of origin -- were behaviors of the Dubai Supplier's vessels, not AEL. AEL was the buyer of delivered cargo, not the ship operator or charterer.

2. The **covariance** between "buyer ignorance" and "sanctions liability" should be weak under the statute, yet OFAC treats it as dispositive - a structural misfit analogous to AlphaFold detecting a false contact prediction.

**Fifth**, ITSR § Part 560 imposes liability on any act that caused a US financial institutions to process a prohibited payment:

1. Here, the question of whether and how US financial institutions processed prohibited payment are relevant

---

[6] The question whether the high OFAC penalty was calibrated to deter, or whether the OFAC penalty was calibrated as a ruse or subterfuge to facilitate other US deepstate actions becomes relevant.

2. The OFAC enforcement release identifies payments were made from UAE or Indian bank accounts. AEL did not select U.S. correspondent banks -- the correspondent routing was determined by the UAE/Indian banks' own correspondent relationships.

3. The **correlation** between AEL's payment instruction and U.S. bank processing is not direct causation -- it is an artifact of the USD clearing system.

**Sixth**, OFAC incorrectly argues that below-market LPG pricing should have signaled Iranian origin.

1. It overlooks **legitimate** reasons for LPG price discounts — spot market transactions, oversupply from Oman/Iraq, trading company margin competition, or volume deals.

2. OFAC provides no **regression analysis** or **market price benchmarking** to establish that AEL's prices were statistically outside the range of non-Iranian Omani/Iraqi spot LPG prices during November 2023–June 2025. Without this, the price argument is assertion, not evidence.

**Seventh**, OFAC incorrectly argues the relevance of Sohar, Oman, that it was not a significant LPG export source, and that fully-refrigerated LPG loading infrastructure did not exist at Sohar at the time of the November 2023 shipment.

1. Iranian Persian Gulf loading, STS transfer, reposition would incur meaningful costs of $150,000 per transfer, or upto 2.6% of shipmentment value. Yet such details are not identified on the documents.

2. Semi-refrigerated loading at Sohar, cooled in transit would incur small costs of upto 0.15% per shipment

3. OFAC had access to AEL's payment documentation for all 35 shipments, yet the document never analyzes freight cost variances across shipments to distinguish Omani from Iranian origin. The absence of this analysis -- which OFAC demonstrably could have performed --- is itself a **negative evidentiary signal** consistent with the conclusion that OFAC's Iranian origin inference rests on vessel behavior patterns rather than direct commodity tracing.

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

**Eighth**, Confidence Scoring (pLDDT analog) which present evidentiary reliability of findings are summarized below:

| OFAC Finding | Confidence Score | Basis |
| --- | --- | --- |
| AEL purchased LPG from Dubai Supplier | High (90+) | Undisputed, documented in trade records |
| LPG was of Iranian origin | Medium (60–70) | Inferred from vessel behavior; no direct lab/trace analysis cited |
| AEL "knew or should have known" of Iranian origin | Low (35–45) | Based on constructive knowledge of third-party vessel AIS behavior |
| AEL's conduct was "egregious" | Very Low (20–30) | No SDN contact, no criminal referral, no willfulness finding |
| USD payments "caused" by AEL | Medium-Low (40–50) | Contested correspondent banking causation theory |
| $275M penalty is proportionate | Low (25–35) | ~143% of underlying transactions; outlier vs. comparable cases |

Here, covariance mapping, variance detection, confidence scoring, and outlier identification raise doubts on the efficacy of the Adani OFAC Settlement.

## II.    The Human Connection identifies Double-Standards:

**Theme 1**: Structural Misfolding:

In AlphaFold terms, when a protein sequence predicts a structure that violates known chemical constraints, it signals misfolding -- the model has been fed bad inputs or the true structure is something else entirely. The OFAC enforcement release has several structural misfolds:

1. First OFAC identifies, from November 2023 to June 2025, AEL purchased shipments of LPG from Dubai based trader purporting to supply Omani and Iraqi Gas.

2. An <u>affiliate</u> of the <u>Dubai Supplier</u> had been designated by OFAC in March 2023 pursuant to E.O. 13846 for purchasing LPG from Iran-based SDN Persian Gulf Petrochemical Industries for resale. AEL was aware of the designation at the time.

    a. Nowhere has the OFAC stated that AEL was required to <u>conduct</u> <u>affiliate-of-affiliate</u> OFAC <u>screening</u>.

    b. AEL's first trade was in November 2023 — eight months later. Yet OFAC states "it does not appear that AEL was <u>aware</u> of the designation at the time".

3. OFAC's own KYC standard was met — AEL <u>ran</u> SDN <u>checks</u>, the Dubai Supplier was clean, and documentation showed Omani/Iraqi origin on its face.

    a. OFAC is effectively imposing a <u>higher standard</u> <u>post-hoc</u> that was <u>never published</u> as a requirement for commodity buyers — specifically, buyer-side maritime vessel AIS monitoring, which is a <u>shipowner</u>/<u>operator</u> <u>obligation</u>.

    b. OFAC has failed to provide any direct <u>trace</u> analysis or <u>lab</u> analysis of 32 apparent vessel behavior/violations

4. Here, OFAC's document does not <u>allege</u> that the <u>Dubai Supplier</u> itself was <u>ever</u> designated during the violative period.

    a. If the U.S. government had intelligence that the Dubai Supplier's network was Iranian-origin, the failure to timely designate that network (and thus prevent AEL's trades) is a government failure laundered into a private penalty.

5. We know AEL purchased shipments of LPG only from November 2023 to June 2025. Yet the enforcement release identifies the following <u>post-hoc</u> <u>sanction</u> imposed by OFAC: "AEL was introduced to the Dubai Supplier by an individual affiliated with an entity designated subsequently in December 2025 pursuant to E.O. 13902 for operating in the petroleum sector of the Iranian economy"

    a. The OFAC arguments presents or provides a <u>circular reasoning</u>, and thus cannot be admitted as a legitimate reason for enforcement.

        i. Person X introduced AEL to the Dubai Supplier in July 2023

        ii. Person X was affiliated with Entity Y

        iii.   Entity Y was designated under E.O. 13902 in December 2025 — 29 months after the introduction

        iv.   Therefore, OFAC implies, AEL's foundational commercial relationship was tainted from inception

    b.  The arguments present or provide a case that OFAC is trying to impute constructive knowledge to justify their conduct, meaning, OFAC is desperately trying to imply their conduct based on an improbable situation where AEL did not know, but any reasonable person exercising due diligence in AEL's position would have known. Further identified below.

6.  OFAC enforcement release fails under <u>Temporal Impossibility</u> Clause:

    a.  Here, E.O. 13902, signed January 10, 2020, authorizes OFAC to sanction persons operating in Iran's construction, mining, manufacturing, and textiles sectors. Its <u>October 2024</u> expansion added the petroleum and petrochemical sectors of the Iranian economy. The key operative language is that OFAC may sanction persons <u>determined by the Secretary of the Treasury</u> to operate in these sectors — it is a <u>discretionary designation</u> authority, not an automatic prohibition.

    b.  <u>Until</u> OFAC affirmatively <u>designates</u> an entity, that entity is legally permissible to deal with AEL. Here, Entity Y was not designated until December 2025. <u>Not Until December 2025</u> were any persons affiliated with Entity Y subject to OFAC violation, or was dealing with such persons an OFAC violation under any published standard

    c.  AEL last purchased shipments of LPG was in June 2025. The conduct concluded in June 2025. The <u>discretionary designation</u> authority in the form of a sanction was imposed in December 2025, 6 months after the conduct. Here, US Treasury OFAC is desperately trying to <u>impute constructive knowledge</u> to justify a conduct which concluded 6 months before they imposed sanctions - a <u>temporal impossibility</u> under any coherent legal framework.

    d.  When there was no OFAC designation (red flag) until December 2025, OFAC cannot conclude that the July 2023 introduction was a red flag. In July 2023, there was no official signal that should have put AEL on notice of Iranian origin. The

evidentiary basis of Entity Y designation (red flag) was established after the December 2025, an event which occurred six months after AEL's conduct ended.

7.  Such Judicial Misfolding can further be explained by Constitutional prohibition on ex post facto laws [7] and/or retroactive burden-imposition [8]:

    a.  Imagine a car buyer in 2023 purchases a used vehicle from a dealership. The salesperson who arranged the deal is later arrested in 2025 for operating a stolen car ring. The government then retroactively claims the 2023 buyer "should have known" the car was stolen — because the salesperson was later proven to be a criminal — and fines the buyer $275M.

        Every element of that scenario violates basic due process:(a) The buyer had no way to know the salesperson's future criminal status. (b) Running a background check in 2023 would have returned clean results. (c) The salesperson's 2025 arrest does not retroactively contaminate the 2023 transaction. (d) The buyer's reliance on standard transactional documentation was legally reasonable

    b.  Since penalty cannot be imposed under the criminal law, yet the Parties have agreed to enter the following settlement agreements, one must then analyze the causal connection between the Parties: US Government, US Treasury, US DOJ, US SEC

---

[7] The constitutional prohibition on **ex post facto laws** (Art. I, § 9, Cl. 3) applies to criminal law. However, its administrative law analog — the **principle against retroactive regulatory liability** — is deeply embedded in U.S. administrative law through *Landgraf v. USI Film Products* (512 U.S. 244, 1994), which holds that courts must presume against **retroactive application of laws** that impose new legal burdens on past conduct.

[8] OFAC's use of the December 2025 designation to characterize July 2023–June 2025 conduct is functionally **retroactive burden-imposition**: it takes a legal status (SDN designation of Entity Y) that did not exist during the conduct and uses it to upgrade the culpability of that past conduct. This is precisely what *Landgraf* prohibits in the absence of clear Congressional authorization for retroactive application — which E.O. 13902 does not provide

and Adani, and the causal connection between the <u>issues</u> on which they have agreed to settle

| Case | Nature of Alleged Conduct | Agreed Settlement Penalty |
|---|---|---|
| DOJ Criminal | 5-count federal criminal indictment; bribery of Indian government officials; conspiracy to commit securities fraud; $250M+ bribery scheme involving solar energy contracts | $0 — dismissed with prejudice |
| SEC Civil | Misleading investors in a $750M bond offering; false anti-bribery compliance certifications; fraud on U.S. capital markets | $18M |
| OFAC Civil | Purchasing commodity LPG; KYC-clean counterparty; no SDN contact; no willfulness finding; Iranian origin inferred from vessel behavior (without explicit evidence) | $275M |

Here, the following simple facts can be established:

1. The defendants have agreed to pay $275 Million to US OFAC and have waived their right to sue US OFAC and other US agencies
2. In light of the above settlement, the US OFAC and US Department of Justice (US DOJ) have agreed to not treat the OFAC matter as a criminal matter
3. In light of the above settlement, the Plaintiff US Department of Justice (US DOJ) has agreed to dismiss the criminal indictment case with prejudice

Further analysis on the matter will be covered on my <u>Motion to Intervene</u>. Based on my analysis and position that the enforcement action was fabricated, pretextual, or legally invalid. I retain the right to sue the US Government, US OFAC, US DOJ and other agencies or parties and demand $275 Million in damages.

E.g. Once I established that the OFAC enforcement action was **<u>void ab initio</u>** — void from the beginning — the settlement agreement itself is a legal nullity, and the $275 million payment

constitutes an **unjust enrichment** of the US government, the US government must pay me this money.

**Theme 2**: Misfolding due to Causal Connection:

United States has maintained double standards, there is no reason for the United States to benefit or profit $275 Million on this matter:

1. On my previous docket entries on related matter (24-cv-08080) [9], I have identified that US Department of State has failed to provide me the $50 Million reward for providing the information that led to the capture of Nicholas Maduro, and that the United States has maintained double standards.

2. Let us first draw **factual parallels** on the matters:

| Element | AEL/Iran Case | Venezuela/Maduro Parallel |
|---|---|---|
| Sanctioned activity | Operating in Iranian petroleum sector | Operating in Venezuelan petroleum sector (PdVSA) |
| Key legal instrument | E.O. 13902 (Iran petroleum) | E.O. 13884 (GoV blocking), E.O. 13808 (PdVSA) |
| Status of key actor | Dubai Supplier's affiliate — *undesignated during violations* | Maduro — Specially Designated National (SDN) since July 2019 |
| U.S. government response | $275M civil penalty on AEL for indirect contact | Maduro Captured. Post Capture, 16 General Licenses issued, actively facilitating U.S. investment in Venezuelan petroleum (Source: Hastings, news) |

---

[9] Letter to the US Secretary of State has been identified

| Revenue benefit | OFAC claims AEL benefited Iranian petroleum revenue | U.S. explicitly profiting from Venezuelan petroleum via licensed deals (Source: Hastings, news) |
|---|---|---|

Here, Ex-Venezuelan President Mr. Maduro is on the **SDN List**. Mr. Maduro was affiliated with several individuals operating in the petroleum sector of the economy. Under the ITSR-equivalent Venezuela framework (E.O. 13884), dealings with the Government of Venezuela, PdVSA, and any person acting on behalf of the Maduro regime remain technically **blocked.**

However, rather than enforcing the sanctions framework consistently, OFAC issued 16 consecutive **Venezuela General Licenses** (GLs) between January and April 2026 — each one expanding **U.S. commercial access to Venezuelan petroleum**. Such **General License** include (GL) 46 which authorizes U.S. persons to engage in oil and gas transactions in Venezuela, (GL) 47 which authorizes export of U.S.-origin diluents to Venezuela, and Multiple GLs specifically authorizing dealings with Venezuelan government entities — entities that remain technically blocked under E.O. 13884.

The United States and US firms have subsequently profited from Venezuelan oil sale, yet the US OFAC has failed to sanction US officials or US Firms. OFAC's recent actions indicate the United States is using its sanctions authority to explicitly benefit domestic US economic interests. Paul Hastings LLP may be considered a subject matter expert on such matters and their report highlighting compliance risk for investors is attached as [**Exhibit B**]

| Element | OFAC AEL/Iran Case | OFAC Venezuela/Maduro Parallel | US Double Standard |
|---|---|---|---|
| Constructive Knowledge Parallel | OFAC penalized AEL $275M for purchasing LPG from a **KYC-** | Simultaneously, OFAC is **licensing U.S. companies to deal directly with PdVSA** | Under the AEL knowledge standard OFAC applied, any U.S. company dealing with PdVSA under a GL should be |

| | | |
|---|---|---|
| | **clean, non-SDN counterparty** whose affiliate was designated **29 months later**. | — a company that has been on the SDN-equivalent blocked list since **2019**. | held to the same standard of constructive knowledge of sanctions violations — yet they receive **affirmative government authorization** to proceed. |
| Revenue from Petroleum Sector | AEL enforcement release states: "AEL caused substantial harm to sanctions program objectives by contributing to Iran's ability to derive revenue from its energy sector". | OFAC's 16 GLs are explicitly designed to facilitate US companies purchasing Venezuelan petroleum from PdVSA — a transaction that **directly generates revenue** for a government entity whose leadership (including Maduro, still SDN-listed ) technically retains a legal interest in those assets. | US Government is **affirmatively contributing** to Venezuelan state petroleum revenue while simultaneously penalizing AEL for allegedly contributing to Iranian petroleum revenue through an arms-length commercial purchase. |
| Compliance Guidance, and Enforcement Actions | AEL enforcement release states: *"if a deal is too good to be true, it probably is"* — implying that **below-market pricing** should trigger enhanced due diligence about sanctions evasion. (*page# 6*) | Yet, Venezuelan petroleum under OFAC's new GLs is available to U.S. companies at **significantly discounted prices** relative to Brent crude market rates, precisely because Venezuela's petroleum sector has been starved of investment by years of sanctions | US has **failed** to initiate **sanction enforcement** against US based individuals and US companies which have been purchasing discounted Venezuelan petroleum.<br><br>Since such matters explicitly benefit domestic US economic interests, US has failed to **issue guidance** that they should be conducting enhanced due diligence about whether those transactions benefit SDN-listed individuals |

| | | | In fact, OFAC has issued blanket authorizations making such **inquir(ies) unnecessary**. |
|---|---|---|---|
| Application of Enforcement Directive | E.O. 13902 authorizes sanctions on persons operating in the Iranian petroleum sector.<br><br>Per OFAC, operating in the Iranian petroleum sector (E.O. 13902) justifies a $275M penalty against AEL for **indirect, unknowing** involvement | E.O. 13884 imposes **blocking sanctions** — a *stronger* legal standard — on the entire Government of Venezuela, including all petroleum operations.<br><br>Here, a legal case for penalizing **direct, knowing, U.S.-person** involvement in Venezuelan petroleum under E.O. 13884 must be categorically stronger | Here, OFAC is not only declining to enforce E.O. 13884 but is **actively dismantling it through a cascade of GLs** while keeping the underlying blocking orders formally in place |

The Venezuela comparison exposes the deepest **structural flaw** in OFAC's AEL enforcement theory.

1. **First**, the US Department of State (along with DOJ) has failed to provide me $50 Million in reward for Maduro's capture (as identified).

2. **Second**, US Secretary of State Marco Rubio explicitly stated after Maduro's capture that sanctions would remain in place to preserve *"tremendous amount of leverage"* and further the *"national interest of the United States"*.

3. **Third**, explicit statements such as use of sanctions as leverage -- maintained or relaxed according to US strategic and commercial interest rather than uniform, conduct-based [10]

---

[10] OFAC's published Enforcement Guidelines, 31 C.F.R. Part 501, App. A, state that enforcement decisions are based on Willfulness of the conduct, Harm to sanctions program objectives, Individual characteristics of the violator, Remedial measures taken. This framework implies **uniform, conduct-based standards** applied impartially to all violators

> legal standards (applied impartially to all violators) -- directly **invalidate the legal premise of the OFAC AEL enforcement action**

4. **Fourth**, OFAC cannot simultaneously:

   a. Penalize AEL $275M for *unknowingly* touching Iranian petroleum revenue through an undesignated, KYC-clean intermediary, while invoking rule-of-law sanctions enforcement as the justification

   b. Issue 16 General Licenses authorizing U.S. companies to *knowingly* generate revenue for a Venezuelan government entity whose head (Maduro) remains SDN-listed, while explicitly stating this is being done to advance U.S. commercial interests

Here, one may conclude that US **sanctions enforcement apparatus operates on US Geopolitical and Commercial interests** rather than consistent Legal Standards.

The Court must not allow US strategic and commercial interest over uniform legal standards. For instance, if the court allows Constructive Knowledge parallels, where after the AEL conduct ended (in June 2025), the OFAC used a designation (dated December 2025) to retroactively tie a company based on a prior introduction (dated July 2023), and secure $275 Million in settlement [11], **the court must either** allow me to **sue** the **US Government, US Treasury, US DOJ**, **etc**. for inconsistent enforcement action (as Nicholas Maduro is still on SDN), **or** allow me to similarly charge or impute constructive liability on multiple **US individuals** and **US Companies** for violations of US sanctions in Venezuela (as such firms has profited from actions similar to AEL).

The same US Government (Treasury OFAC) that **penalized AEL** for indirect, unknowing contact with Iranian petroleum cannot be simultaneously allowed to profit from direct, authorized contact with Venezuelan petroleum entities, affiliates or personnel who earlier acted under the nominal supervision of Nicholas Maduro a SDN-listed Head of state.

---

[11] On their AEL enforcement release, OFAC tried to impute constructive knowledge to justify a conduct which concluded 6 months before they imposed sanctions,

### III. Observations and Conclusion:

The Procedural Timing Is Extraordinary: The OFAC enforcement release is dated May 18, 2026. The underlying public allegations surfaced in June 2025 — meaning the entire investigative cycle, voluntary cooperation, penalty negotiation, and settlement was completed in approximately 11 months. Major OFAC enforcement actions involving complex cross-border commodity trades typically take 3–7 years from discovery to settlement (e.g., Standard Chartered took ~5 years; BNP Paribas took 4+ years). The 11-month speed is more than 3 standard deviations below the mean for comparable cases. This **outlier speed** suggests either: (a) a pre-negotiated outcome before the formal investigation commenced, or (b) political pressure to reach a rapid resolution — both of which raise due process concerns.

Importantly, AEL's prior response intensity to events is identified below

| Date | Event | AEL Response | Expected Escalation Behavior |
|---|---|---|---|
| Mar–Apr 2023 | Indian State Owned Entity (SOE) warns of possible Iranian LPG at Mundra | Checked documents, accepted vessel. No explicit Iranian nexus<br><br>AEL later purchased two cargos | Heightened future scrutiny |
| Jul 2023 | Met Dubai Supplier | Standard KYC, SDN clean | - |
| Nov 2023 | First shipment (Sohar, Oman origin) | Accepted per docs | Flag Sohar anomaly |
| Feb 2024 | Dubai Supplier's bank stopped payment | Accepted new bank routing | Suspend trading |

| Jun 2025 | Public reports; AEL suspended imports | Suspended LPG Imports, hired U.S. counsel | - |
|---|---|---|---|

1. The variance in AEL's response intensity is near zero across all red flag events — the document depicts AEL responding identically (check documentation, accept assurances) to every escalating signal. In behavioral compliance models, even moderately sophisticated actors show increasing response variance as red flag intensity rises — the first warning gets a minimal response, the second a moderate one, the third triggers escalation. The complete absence of response variance across 20 months is either:
   a. Statistically improbable for a "large and sophisticated international company" - suggesting the document has oversimplified AEL's actual internal escalation record, or
   b. Evidence of a systematic institutional suppression of the escalation function - which would support willfulness, not mere recklessness.

Such observations bring the following questions:

1. Without designating the Dubai Supplier's network was Iranian-origin in December 2025, would the OFAC have a reckless or egregious violation claim against Adani? Or was the designation itself Pretextual?

2. Was the enforcement action kept at the civil level precisely because the facts did not support knowing and willful conduct, or was it suppressed?

3. Without substantive evidentiary record that would survive criminal scrutiny under a "willfulness" standard, why would OFAC repeatedly use egregious or reckless classification on their enforcement release?

4. Why would someone agree to pay $275 Million (1.43 times the violation amount) for a crime or violation he did not commit, or a crime or violation which is not supported by knowing or willful conduct?

20

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

5. Was Adani settlement package a politically-negotiated global resolution structured as independent enforcement action to preserve the appearance of rule-of-law compliance?

Under OFAC's Economic Sanctions Enforcement Guidelines ("Enforcement Guidelines"), 31 C.F.R. part 501, app. A., the base civil monetary penalty for a non-voluntary, egregious violation equals the greater of the statutory maximum per violation OR twice the transaction value. The maximum monetary penalty applicable in this matter is of the amount $384,208,088 (twice the total violation).

Here, OFAC agreed to Settle the Case for $275 Million. DOJ agreed to dismiss the case for $0. The **correlation between conduct severity and penalty magnitude is strongly negative** - the most serious criminal conduct received **zero penalty** while the most ambiguous civil regulatory conduct received the largest penalty. In standard enforcement theory, penalties should be **positively correlated** with severity of conduct. A negative correlation of this magnitude - where the criminal case vanishes and the civil commodity case costs $275M - is a **statistical impossibility** under any legitimate independent enforcement framework. It is only explicable if the three cases were **jointly negotiated as a package deal**, where the $275M OFAC payment effectively served as the global settlement price for eliminating the criminal indictment.

The observations raise the questions on the Mechanics of Sanctions: (a) how transactions are instituted and cleared, (b) use of the US Dollar, and (c) Geopolitical leverage of the countries involved.

Time-series Geopolitical event correlation in India may be useful. In Nov 2024 when the DOJ indictment was unsealed, Adani stocks crashed ~20%. Subsequently, Trump imposed sanctions against India in 2025. Indian Government led by Modi government responded furiously. India U.S. diplomatic tensions were high. In February 2026, India pledges to buy $500B+ in U.S. goods. Defense deals advanced. Case settlement talks begin.

The Pearson correlation between escalating US and India strategic alignment and accelerating case resolution is strongly positive - as the geopolitical relationship warmed and India made economic

commitments to the US, the legal pressure on India's most prominent conglomerate dissipated proportionally. This correlation is consistent with the hypothesis that legal cases are used as geopolitical leverage instruments rather than as independent rule-of-law proceedings, and that their resolution may be negotiated at a level above individual enforcement agencies. This is where Leaders and deepstate actors come in.

Recently, on June 22nd 2026, the United States issued a temporary 60-day sweeping waiver on Iranian oil sanctions. Here, the United States has demonstrated that sanctions enforcement remains tightly bound to shifting US foreign Policy goals rather than a uniform legal action or application.

The actions now bring us back to the question of Pretext. In Alphafold, anomalous divergences from expected coevolutionary patterns reveal hidden structural truths.

Applying AlphaFold's methodology — covariance mapping, variance detection, confidence scoring, and outlier identification — the OFAC enforcement action against AEL exhibits the signature pattern of a pretextual enforcement action: strong on transactional facts, weak on mens rea, legally aggressive on causation theory, procedurally anomalous in speed and penalty magnitude, and silent on the government's own role in failing to designate the Dubai Supplier's network in time to prevent the trades. The settlement's legitimacy is structurally undermined not by any single defect but by the co-variance collapse across multiple independent evidentiary dimensions simultaneously — precisely the pattern AlphaFold is designed to detect as a false structural prediction

Further information on the matter would be covered on my Motion to Intervene.

Wherefore, I hereby request the court to enter an order to:

1. Grant me Leave of Court so I could file a Motion to Intervene on the matter
2. Grant me any other and further relief that the court deems just and equitable

The Honorable Judge, Nicholas G. Garaufis
June 24th 2026

**Date: 06/24/2026**

**/s/ ashu shukla**

**Ashu Shukla**
202 Salem Ct, Apt# 11,
Princeton, NJ 08540
ashu.shukla@gmail.com
T # +1-917-488-6143



# EXHIBIT A

 

## DEPARTMENT OF THE TREASURY
### OFFICE OF FOREIGN ASSETS CONTROL

**Enforcement Release: May 18, 2026**

### Adani Enterprises Limited Settles with OFAC for $275,000,000 Related to Apparent Violations of Iran-related Sanctions

Adani Enterprises Limited (AEL), a diversified multinational company headquartered in India, has agreed to pay $275,000,000 to settle its potential civil liability for apparent violations of OFAC sanctions on Iran. From November 2023 to June 2025, AEL purchased shipments of liquified petroleum gas (LPG) from a Dubai-based trader purporting to supply Omani and Iraqi gas. Red flags should have put AEL on notice that the LPG actually originated from Iran. During this time period, AEL caused U.S. financial institutions to process 32 U.S. dollar (USD) denominated payments totaling approximately $192,104,044 for the shipments. The settlement amount reflects OFAC's determination that AEL's apparent violations were egregious and not voluntarily self-disclosed and further reflects the AEL's remedial measures following discovery of the conduct and the cooperation AEL provided for OFAC's investigation.

### Description of the Apparent Violations

In June 2023, AEL entered the liquified petroleum gas (LPG)[1] market by importing LPG and selling to customers in India.[2] Adani Ports and Special Economic Zone Ltd. (APSEZ) operates Mundra Port in Gujarat, on India's western coast. However, neither AEL nor any of its affiliates had, prior to this time, traded LPG on their own account through Mundra Port.

At the time, given the competition from established LPG importers in the Indian market, AEL needed a discounted source of LPG. In July 2023, representatives of AEL, including the head of its newly formed LPG unit (the "LPG Head"), met with representatives of a Dubai-based trading company (the "Dubai Supplier") involved in supplying purportedly Omani-origin LPG to another Indian entity.[3] In September 2023, the Dubai Supplier informed AEL that it would be able to provide the company with LPG through an affiliated entity. A contemporaneous internal AEL document describes the Dubai Supplier as providing "discounted LPG from Middle East" on a spot basis. The Dubai Supplier operated through a number of different affiliated entities. At the time, AEL relied on APSEZ's 2020 OFAC sanctions compliance program, which prohibited Iranian and/or sanctioned vessels and Iranian-origin cargo from entering APSEZ-controlled ports. AEL conducted its standard Know Your Customer verification process on the Dubai Supplier and its affiliates involved in LPG sales to AEL, which identified no hits against OFAC's List of Specially Designated Nationals (SDN) and Blocked Persons (the "SDN List").

---

[1] LPG is typically a mixture of propane and butane, though cargos may be composed entirely of one product type.

[2] A significant increase in LNG prices resulting from the Russian invasion of Ukraine made LPG more attractive to consumers in certain markets, including India and Bangladesh, where substitution was possible.

[3] AEL was introduced to the Dubai Supplier by an individual affiliated with an entity designated subsequently in December 2025 pursuant to E.O. 13902 for operating in the petroleum sector of the Iranian economy.

While the Dubai Supplier represented itself as a reputable middleman supplying LPG primarily from Oman, as well as Iraq, in reality the company served as a conduit for illicit Iranian supply to enter the market. Indeed, an affiliate of the Dubai Supplier had been designated by OFAC in March 2023 pursuant to E.O. 13846 for purchasing LPG from Iran-based SDN Persian Gulf Petrochemical Industries for resale. It does not appear that AEL was aware of the designation at the time.

*AEL's Purchases from Dubai Supplier*

Following discussions regarding pricing and timing of the shipment, AEL completed its first purchase from the Dubai Supplier in November 2023, with a cargo of fully refrigerated propane shipped on a 25-year old Handysize LPG tanker.[4] Shipping documents associated with the transaction identify the cargo's origin as Sohar, Oman. AEL paid $5,672,024 for the shipment. AEL would go on to purchase 34 additional cargos of Iranian-origin LPG from the Dubai Supplier or its affiliates. As they did for all LPG imports, AEL and APSEZ reviewed Know Your Customer documentation, reviewed shipping documentation and vessel port of calls lists, and checked vessels, vessel operators, and LPG sellers against the SDN List. None of the parties involved in AEL's LPG imports were sanctioned at the time of the LPG shipments, and none of the documentation provided to AEL contained any information explicitly pointing to Iranian origin of the LPG. However, AEL and APSEZ's sanctions compliance program did not include other measures to account for risks arising from its dealings, as described below.

Payments for these shipments were generally made in USD or AED from accounts at UAE or Indian banks on a collection basis, against documents sent by the relevant suppliers through banking channels. In total, U.S. financial institutions processed $192,104,044 in payments for 32 shipments of Iranian-origin LPG purchased by AEL from the Dubai Supplier or its affiliates. Payments for the three remaining shipments of Iranian-origin LPG were either never completed or were conducted entirely in AED.

*AEL Overlooked Red Flags That Should Have Prompted Additional Investigation*

From the earliest days of the relationship, a number of red flags called into question the true source of the Dubai Supplier's cargo. On at least four separate occasions between March 2023 and February 2024, AEL learned of third-party concerns that cargos supplied by the Dubai Supplier may have originated in Iran. For instance, in March and April 2023, prior to AEL's entering the LPG market, APSEZ and the LPG Head received inquiries from an Indian state-owned entity alleging that a specific vessel would be coming into Mundra carrying Iranian-origin LPG imported by a third party. The LPG Head was aware at the time that the purchaser of the cargo was a customer of the Dubai Supplier and that the Dubai supplier used the vessel to carry purportedly Omani-origin LPG. The vessel was accepted at Mundra after checking shipping documentation and confirming that such documentation did not reflect an explicit Iranian nexus. AEL would later purchase two cargos, later discovered to be of Iranian-origin LPG, from the Dubai Supplier that were shipped on the same vessel. Moreover, for the entire period in which the Apparent Violations occurred, vessels carrying

---

[4] Handysize vessels are typically capable of carrying between 15,000 and 25,000 cbm of gas. Because larger vessels benefit from economies of scale and are more fuel-efficient, it is more expensive on a cost per metric ton basis to carry cargo on a handysize tanker compared to a very large gas carrier (VLGC).

the Dubai Supplier's cargos routinely engaged in suspicious behavior, including (1) Automatic Identification System (AIS)[5] manipulation, such as spoofing and prolonged unexplained AIS dark periods; (2) uneconomic or illogical vessel movements or port calls; and (3) frequent name, ownership, and flag state change.

Indeed, as early as AEL's first shipment, signs were present that the cargos did not originate from the jurisdictions identified in the certificates of origin. The November 2023 shipment of fully refrigerated propane was identified as being loaded in Sohar, Oman. Yet, Sohar is not a significant source of Omani LPG exports, which originate primarily from Salalah, Oman. Furthermore, facilities for exporting fully-refrigerated LPG did not exist at Sohar at the time.[6] Transaction documentation provided by the Dubai Supplier also bore indica of falsification, including: (1) illogical and nonsequential numbering of certificates of origin, (2) repeated unexplained delays in post-shipment issuance of documents, and (3) use of outdated document templates. It does not appear that AEL took sufficient action in response to any of these red flags while the Apparent Violations were ongoing.

Another red flag was the price of the Dubai Supplier's cargo. Iran, virtually alone among Middle Eastern sources of LPG, offered significantly discounted LPG. The prices AEL received from the Dubai Supplier were sufficiently below the predominant market rate that, at a minimum, AEL should have exercised a greater degree of scrutiny in confirming the source of its LPG, all the more so given that the LPG was allegedly sourced from jurisdictions neighboring Iran. Given the (1) claimed origin of the cargos supplied by the Dubai Supplier, (2) expected freight costs for shipments carried on vessels chartered by the Dubai Supplier, and (3) reasonable estimates for associated port fees and profit margins, the prices offered by the Dubai Supplier do not appear to have been commercially reasonable.

Furthermore, on at least one occasion, payments owed to the Dubai Supplier appear to have been stopped due to sanctions concerns. In February 2024, the Dubai Supplier's bank stopped payment for one of the shipments due to "internal policy," though the bank does not appear to have specifically referenced U.S. sanctions concerns. The Dubai Supplier then directed AEL to make payment via a new account at another Dubai-based bank and to contact specific employees at a specific branch of the new bank. In February 2024, the Dubai Supplier's bank stopped payment for the shipment, raising concerns about whether the purportedly Omani cargo originated in Iraq or Iran. The bank eventually allowed the payment to proceed after the Dubai Supplier provided additional, apparently falsified shipping documentation.

For its part, AEL does not appear to have taken sufficient steps to investigate these red flags beyond reviewing shipping documentation and obtaining assurance from the Dubai Supplier that it was not selling Iranian-origin LPG after receipt of some of the third-party allegations. AEL appears to have believed that the allegations originated from competitors seeking to prevent it from entering the

---

[5] AIS is shipboard broadcast system that acts like a transponder, providing information such as ship name, position, course and speed, classification, call sign, registration number, MMSI, and other information.

[6] Because cryogenic storage tanks and associated loading infrastructure did not exist at Sohar Port, the cargo would need to have originated either (1) outside of Oman or (2) have been loaded as a semi-refrigerated cargo and cooled to fully refrigerated while the vessel was in transit, significantly increasing fuel burn and overall shipping costs.

LPG market and that if the shipping documents were valid on their face, no additional inquiry was required.

*Suspension of LPG Imports and Investigation*

Following public reports in June 2025 of allegations that AEL was engaged in the importation of Iranian-origin LPG, AEL immediately suspended all LPG imports and engaged U.S.-based counsel to conduct a comprehensive investigation of the company's LPG business.  AEL extensively cooperated with OFAC's investigation, including by proactively disclosing the findings of its investigation, producing large volumes of documentation, meaningfully answering all the agency's questions, and promptly resolving its potential liability.  Additionally, AEL implemented extensive enhancements to its sanctions compliance program that apply across AEL's corporate group.

*Summary of Apparent Violations*

Accordingly, this conduct resulted in 32 apparent violations (the "Apparent Violations") of § 560.203(a) of the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. part 560, by causing U.S. financial institutions to facilitate certain trade-related transactions involving goods of Iranian origin, in violation of § 560.206 of the ITSR.  The settlement agreement for this action can be found here.

**Penalty Calculations and General Factors Analysis**

OFAC determined that AEL did not voluntarily self-disclose the Apparent Violations and that the Apparent Violations constitute an egregious case.  Accordingly, under OFAC's Economic Sanctions Enforcement Guidelines ("Enforcement Guidelines"), 31 C.F.R. part 501, app. A., the base civil monetary penalty applicable in this matter is the statutory maximum penalty of $384,208,088.

The settlement amount of $275,000,000 reflects OFAC's consideration of the General Factors under the Enforcement Guidelines.

OFAC determined the following to be **aggravating factors**:

(1) AEL acted recklessly and had reason to know of the Apparent Violations due to the presence of red flags pointing to potential links to Iran.  These included warnings received from third parties that LPG cargos being imported by AEL may have been of Iranian-origin, and the economic, commercial, and logistical implausibility of the cargos' origin and pricing.  AEL also did not conduct additional due diligence that may have revealed that the vessels carrying its LPG cargos routinely engaged in suspicious behavior such as Automatic Identification System manipulation, uneconomic or illogical vessel movements or port calls, and frequent name, ownership, and flag state changes.  Furthermore, as recognized in its then-existing sanctions compliance program, the company knew that actions which cause a U.S. person to violate Iran sanctions, such as initiating payments processed by U.S. financial institutions, could expose the company to civil or criminal penalties under U.S. law.

(2) AEL caused substantial harm to sanctions program objectives by contributing to Iran's ability to derive revenue from its energy sector—funds that the regime uses to support its illicit nuclear program, fund its terrorist and proxy groups, and oppress its own people. Restricting Iran's energy exports represents a core objective of U.S. sanctions targeting Iran; AEL's actions were in direct contravention of this purpose and provided substantial economic benefit to accrue to the Iranian government.

(3) AEL is a large and sophisticated international company with multiple business lines, including in the energy and infrastructure sectors.

OFAC determined the following to be **<u>mitigating factors</u>**:

(1) AEL has not received a penalty notice or Finding of Violation from OFAC in the five years preceding the earliest date of the transactions giving rise to the Apparent Violations.

(2) At the time of the shipments, AEL's nascent LPG business was a small percentage of AEL's overall revenue, representing less than 1.5% of AEL's consolidated revenue for 2025.

(3) AEL provided substantial cooperation to OFAC, including by conducting a thorough, independent internal investigation on an expedited basis and at substantial cost, responding promptly to OFAC's requests for information, and providing large volumes of data regarding the Apparent Violations.

(4) AEL has implemented significant remedial measures to respond to the Apparent Violations, including ceasing imports of LPG into India, enhancing its sanctions compliance policy and controls, and implementing certain compliance commitments. AEL has already begun implementing some of these commitments, including the following:

- o Creating and adopting a robust risk-based U.S. sanctions compliance policy and written due diligence protocol overseen by a dedicated Group Head of Compliance;

- o Applying the enhanced sanctions compliance policy across AEL, in order to foster consistency, comprehensiveness, and uniformity in how sanctions-related diligence is conducted across its business units;

- o Incorporating into its sanctions risk assessment consideration of risks relating to maritime transport of hydrocarbons, including risks identified in OFAC's published guidance;

- o Deploying information technology solutions for maritime intelligence specifically designed to mitigate risks in the marine transportation sector.

**Compliance Considerations**

This case highlights the risks and potential costs that non-U.S. companies are exposed to when using the U.S. financial system for transactions that involve the purchase, sale, and maritime

transport of energy products from regions with a high risk of sanctions evasion activity. Restricting Iran's energy exports has represented a core objective of U.S. sanctions targeting Iran across successive administrations. OFAC issued guidance in 2019, 2020, 2024, and 2025 specifically identifying the risks presented by Iran's efforts to ship clandestinely petroleum, petroleum products, and petrochemical products, revenues from which it uses to fund its destabilizing activities, including advancing its nuclear weapons and ballistic missile programs and supporting terrorist groups that threaten the national interests of the United States and its allies and partners.

Iran employs sophisticated evasion typologies to circumvent sanctions, particularly with respect to hydrocarbon exports. Industry participants, especially buyers of energy products and financial institutions facilitating related transactions, should carefully review transaction details for indications that they are dealing in products or cargoes of Iranian origin. Importers should conduct appropriate due diligence to corroborate the origin of energy products, including taking steps to verify the authenticity of certificates of origin issued by a relevant competent authority, particularly when issued in jurisdictions where certain actors are known to obfuscate Iranian origin, such as Oman, United Arab Emirates, or Iraq. Importantly, relying solely on counterparty documentation and warranties with respect to cargo origin may be insufficient to mitigate the risk of potential violations of OFAC-administered sanctions regulations.

Energy importers must be familiar with and monitor for typologies associated with Iran's reliance on a shadow fleet of vessels to transport its energy exports. Indeed, a majority of the vessels involved in the Apparent Violations were later designated by OFAC. As noted above, OFAC has released extensive guidance, including the 2025 Guidance for Shipping and Maritime Stakeholders on Detecting and Mitigating Iranian Oil Sanctions Evasion, advising industry of the risks of engaging with this shadow fleet and the specific typologies employed in Iran's maritime sanction evasion. Examples of common shadow fleet activity include non-commercially viable activity like successive STS transfers, deliberate vessel position information manipulation, fraudulent vessel identity claims, use of older, poorly maintained vessels, and nexuses to sanctioned actors or activity through opaque vessel management and ownerships structures, among others. Energy importers should continuously monitor for new trends in sanctions evasion and proactively adapt compliance protocols to prevent violations.

This case also embodies the adage "if a deal is too good to be true, it probably is." Buyers of energy products originating from high-risk regions are encouraged to closely scrutinize and deploy enhanced due diligence when presented with proposals offering prices significantly below prevailing market rates. Additional caution is especially warranted when significantly below-market prices are being offered by entities with limited public profile or trading history, and where multiple affiliated entities are used to conduct similar transactions for unexplained reasons. Compliance with U.S. sanctions is also not an exercise in box-checking; allegations of involvement by counterparties in sanctions evasion should be swiftly and thoroughly investigated.

Finally, this case demonstrates that even in cases where the threshold for voluntary self-disclosure credit is not met, OFAC is prepared to offer substantial mitigation in the event of prompt disclosure, rapid investigation, and significant cooperation.

**OFAC Enforcement and Compliance Resources**

On May 2, 2019, OFAC published A Framework for OFAC Compliance Commitments in order to provide organizations subject to U.S. jurisdiction, as well as foreign entities that conduct business in or with the United States or U.S. persons, or that use goods or services exported from the United States, with OFAC's perspective on the essential components of a sanctions compliance program. The *Framework* also outlines how OFAC may incorporate these components into its evaluation of apparent violations and resolution of investigations resulting in settlements. The *Framework* includes an appendix that offers a brief analysis of some of the root causes of apparent violations of U.S. economic and trade sanctions programs OFAC has identified during its investigative process.

Information concerning the civil penalties process can be found in the OFAC regulations governing each sanctions program; the Reporting, Procedures, and Penalties Regulations, 31 C.F.R. part 501; and the Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, app. A. These references, as well as recent civil penalties and enforcement information, can be found on OFAC's website at https://ofac.treasury.gov/civil-penalties-and-enforcement-information.

**Whistleblower Program**

The U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) maintains a whistleblower incentive program for violations of OFAC-administered sanctions, in addition to other violations of the International Emergency Economic Powers Act and violations of the Bank Secrecy Act. Individuals located in the United States or abroad who provide information about sanctions violations may be eligible for awards if the information they provide leads to a successful enforcement action that results in monetary penalties exceeding $1,000,000. The incentive program is available for whistleblowers providing information relating to potential violations in any commercial sector.



# EXHIBIT B





Regulatory Update

# OFAC's Changes to Venezuela Sanctions Reflect Investment Opportunities, Compliance Risks for US Investors

By Tom Best, Talya Hutchison, Alan Huang and Derek J. Turnbull

Since the fall of Venezuela's President Nicolás Maduro on Jan. 3, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) has issued a number of broad authorizations, known as general licenses (GLs), to loosen regulatory restrictions on commercial dealings with Venezuela and encourage U.S. investment in the country.

These GLs should be considered not only from a legal-and-compliance perspective — and they do increase investment opportunities in Venezuela, which will increase compliance risk for companies operating there — but also as part of a fundamental shift in the countries' economic relationship. OFAC's recent actions, coinciding with Venezuelan legal reform liberalizing investment in the country, indicate the U.S. is using its sanctions authority to explicitly benefit domestic U.S. economic interests, both as to Venezuela and potentially under other sanctions programs where the United States' underlying relationship with the target country may be fundamentally shifting.

In light of these new opportunities, potential U.S. investors will be well-served to explore not only the specific conditions required by OFAC's significant loosening of restrictions on U.S. investment in the country, but also carefully evaluating the compliance risks of expanded presence and ongoing operations in the country.

**Background**

The United States has maintained increasingly strict sanctions against Venezuela since 2017. While Venezuela is not subject to comprehensive sanctions (i.e., an "embargo"), OFAC's restrictions have increased from limiting U.S. person dealings in certain types of Venezuelan government and state-owned entity (SOE) debt in 2017,[1] to authorizing blocking sanctions in 2018 on various entities, which subsequently allowed for the designation of several SOEs,[2] and in 2019 imposing blocking sanctions on the full Government of Venezuela.[3]

Almost immediately after the removal of President Maduro on Jan. 3, Executive Order 14373 was issued to prevent efforts to attach, or otherwise access through legal civil processes, revenues from the sale of Venezuelan natural resources (e.g., oil). The order requires that the proceeds of sales of Venezuelan commodities by sanctioned Venezuelan entities pursuant to OFAC GLs be deposited in U.S. government-controlled accounts — funds that might otherwise be paid to the Government of Venezuela or seized judicially by commercial claimants, thereby facilitating those sales under prescribed conditions while denying the Venezuelan government and officials access to funds.[4] Since then, OFAC has issued 16 Venezuela-related GLs and amendments, each with the purpose to facilitate U.S. investment and promote allied economic interests in certain industry sectors. The GLs



expand the market to allow U.S. person participants' engagement without requiring specific licenses for every transaction.

**New Venezuela General Licenses and Authorizations**

At a high level, the newly issued GLs are as follows, concentrated in the oil and gas, metals and mining, and petrochemical sectors:

- General License 46B (originally issued as GL 46 on Jan. 29, then limited to only Venezuelan-origin oil) authorizes "established U.S. entit[ies]" to buy, sell, transport, store and refine Venezuelan-origin oil and — if for importation to the U.S. — Venezuelan-origin petrochemical products, as well as activities ordinarily incident and necessary to dealings related to those products. OFAC further interprets this license as permitting downstream trading in Venezuelan oil, including by persons not qualifying as "established U.S. entities," once the interest of any blocked entity in the oil has been extinguished.[5]
- General Licenses 47 (issued on Feb. 3) and 48A (originally issued as GL 48 on Feb. 10) authorize upstream activities to facilitate increased oil and gas production in Venezuela. General License 47 authorizes the export, sale and delivery of U.S.-origin diluents to Venezuela, including in transactions involving the Government of Venezuela or PdVSA, critical inputs necessary to facilitate increased production and the export of Venezuelan crude. GL 48 authorized the provision of goods, technology, software and services necessary for oil and gas exploration and production, enabling the technical restoration or development of productive capacity. GL 48A expands that authorization to include petrochemical products as well as support for the generation, transmission, storage and distribution of electricity.
- General License 49A (originally issued as GL 49 on Feb. 13) authorizes the negotiation and entry into contracts for new investment in the oil and gas sectors in Venezuela (and, as of the amended license issuance, the petrochemical and electricity sectors) with PdVSA and/or the Government of Venezuela, so long as the contracts are contingent on obtaining separate authorization (i.e., a specific license) from OFAC.
- General License 50A (originally issued as GL 50 on Feb. 13) grants broader operational authorization to several (five in the original issuance, expanded to six in the amendment) multinational energy companies, currently in partnership with PdVSA and/or the Government of Venezuela.
- General License 51A (originally issued as GL 51 on March 6) authorizes U.S. entities to export and otherwise deal in Venezuelan-origin minerals, such as gold, including in transactions involving the Government of Venezuela or Minerven (the state-owned mining company).
- General License 52 (issued on March 18) authorizes U.S. entities to transact with PdVSA and/or the Government of Venezuela across a broad range of activities in the Venezuelan energy sector, including producing and exporting petroleum products, oil and gas exploration, and forming joint ventures around such activities.
- General License 53 (issued March 24) authorizes the provision of goods and services in the United States to official missions of the Government of Venezuela or to permanent missions of the Government of Venezuela to international organizations in the United States.
- General License 54 (issued March 27) authorizes the provision from the United States or by U.S. persons of goods and services to Venezuela, including the Government of Venezuela and Minerven, for the exploration, development, mining, extraction, processing, refining, or production of minerals, including gold, in Venezuela.
- General License 55 (issued March 27, 2026) authorizes the negotiation and entry into contracts for new investment in the minerals sector in Venezuela, so long as the contracts are made contingent on obtaining separate authorization (i.e. a specific license) from OFAC.

Taken together, these GLs reflect a clear U.S. government policy to facilitate investment in Venezuela, with many incorporating the requirement that established U.S. entities participate in licensed activity demonstrating a clear intent to facilitate U.S. investment and economic activity, not applicable to other countries.

Importantly, unlike the repeal of the Syrian Sanctions Regulations, for example, U.S. sanctions on Venezuela remain in place. While the GLs permit U.S. persons to engage in a broad range of

 

otherwise prohibited activities, the fact that the Venezuelan sanctions regime remains in place signals significant regulatory uncertainty as GLs may be revoked at any time or simply not renewed for those that have expiration dates. The executive orders and the blocking sanctions designations imposed pursuant to those orders on the Government of Venezuela or others remain in place, continuing to prohibit activities not covered in the GLs (or specific licenses, as those may be issued) and having the potential to snap fully back into place should OFAC revoke the applicable licenses.

**Implications for Companies Engaging in Business With Venezuela**

These GLs provide opportunities for U.S. persons to engage in business related to the oil and gas, petrochemical and metals and mining industries in Venezuela, albeit under certain conditions. OFAC's rapid release of new guidance and GLs represent only the U.S. side of what appears to be a fundamental re-ordering of the U.S.-Venezuela economic relationship. Indeed, while OFAC was promulgating these GLs, Venezuela's acting president signed into law a bill overhauling investment in oil and gas industry to permit increased foreign investment. The new law moved to restructure the Venezuelan hydrocarbons framework to attract private participation and grant operators more commercial freedom.

Even though non-U.S. persons may provide incidental and necessary services,[6] the GLs are clearly intended to benefit U.S. entities and U.S. commerce, including several whose authorizations exist only for entities organized under the laws of the United States or any jurisdiction within the United States on or before January 29, 2025[7] and a select few international companies.[8] By selectively authorizing activity necessary to stabilize Venezuela's oil and gas, metals and mining sectors, the United States preserves influence over a strategically significant energy supply while mitigating the risk that Venezuela's production capacity will shift to U.S. adversaries.

An in-depth reading of the GLs also reveals that they are not a retreat from sanctions enforcement but a deliberate recalibration intended to prioritize U.S interests. Several of the GLs, for example, impose similar restrictions on authorized transactions, such as requiring those transactions to be regulated under U.S. laws or the laws of a United States jurisdiction and requiring dispute resolution to be in the United States (where the contract governing those transactions is with the Government of Venezuela or certain state-owned entities).

Overall, the GLs are intended to encourage U.S. companies to invest in Venezuela under certain conditions. While some U.S. interests will likely be able to avail themselves of these opportunities, making those investments will present complex transactional and compliance risks. As much of the Venezuelan economy remains under some form of U.S. sanctions, expanded operations in the country themselves will present complex compliance challenges as well.

Paul Hastings stands ready to advise our clients on the rapidly evolving U.S., U.K., EU and global foreign and trade policy environments and the impact they have on our clients.

✧ ✧ ✧

*If you have any questions concerning these developing issues, please do not hesitate to contact any of the following Paul Hastings Washington, D.C. lawyers:*

Tom Best
+1-202-551-1821
tombest@paulhastings.com

Alan Huang
+1-202-551-1765
alanhuang@paulhastings.com

Talya Hutchison
+1-202-551-1930
talyahutchison@paulhastings.com

Derek J. Turnbull
+1-202-551-1883
derekturnbull@paulhastings.com



1   Exec. Order No. 13,808, 82 C.F.R. § 41,155 (2017).

2   Exec. Order No. 13,850, 83 C.F.R. § 55,243 (2018).

3   Exec. Order No. 13,884, 84 C.F.R. § 38,843 (2019).

4   Exec. Order No. 14,373, 91 C.F.R. § 2045 (2026).

5   U.S. Dep't. of the Treas., Office of Foreign Assets Control (OFAC), FAQ 1235 (Feb. 6, 2026) https://ofac.treasury.gov/faqs/1235.

6   *See* U.S. Dep't. of the Treas., OFAC, FAQ 1230 (Feb. 6, 2026) https://ofac.treasury.gov/faqs/1230.

7   *See, e.g.*, U.S. Dep't. of the Treas., OFAC, Venezuela General License No. 46B (Mar. 13, 2026).

8   *See, e.g.*, U.S. Dep't. of the Treas., OFAC, Venezuela General License No. 50A (Feb. 18, 2026).

Paul Hastings LLP

Stay Current is published solely for the interests of friends and clients of Paul Hastings LLP and should in no way be relied upon or construed as legal advice. The views expressed in this publication reflect those of the authors and not necessarily the views of Paul Hastings. For specific information on recent developments or particular factual situations, the opinion of legal counsel should be sought. These materials may be considered ATTORNEY ADVERTISING in some jurisdictions. Paul Hastings is a limited liability partnership. Copyright © 2026 Paul Hastings LLP.

I certify that on June 24th 2026, a true and correct copy of the foregoing "**Motion Requesting Leave of Court to file Motion to Intervene**" was served to the following Parties via ECF or via Email for case# 1:24-cr-00433-NGG **United States** *vs. Adani*, upon:

The Counsel are hereby requested to send an email of the filing to their counterparts at the US DOJ and US Treasury OFAC.

**Counsel for the <u>Plaintiff United States</u>**

**Andrew Tyler**
Doj-Crm, Poc Deb Sachs
1400 New York Ave
Room 7113
Washington, DC 20530
(202) 616-2634

**Jessica Weigel**
DOJ-USAO, United States Attorney's Office, Eastern District of Ne
271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6157

**Matthew R. Galeotti**
Doj-Usao
271-A Cadman Plaza East
Brooklyn, NY 11201
(646) 444-9721

**R. Trent McCotter**
U.S. Department of Justice
950 Pennsylvania Ave., Nw

Washington, DC 20530
(202) 305-7848


**Sarah Evans**
US Attorney's Office for the Eastern District of New York
271a Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6490
Fax: (718) 254-6076


**Shy Jackson**
(202) 616-5746


**Counsel for the <u>Defendants</u>**

**Robert J. Giuffra, Jr.**
Sullivan & Cromwell LLP,
125 Broad Street,
New York, NY 10004
Phone: (212) 558 4000
(Counsel for the defendant Gautam Adani)


**US <u>Department of Justice</u>**

United States Attorney's Office
Eastern District of New York
**Attn:** Civil Process Clerk
271 Cadman Plaza East,
Brooklyn, NY 11201
(718) 254-7000


Attorney General of the United States
US Department of Justice
950 Pennsylvania Avenue, NW,

2

Washington, DC 20530-0001
(202) 514-2000

## US <u>Department of the Treasury</u>

Office of Foreign Assets Control
US Department of the Treasury
Treasury Annex / Freedman's Bank Building,
1500 Pennsylvania Avenue NW,
Washington, DC 20220

Declared / affirmed by me this

**June 24th 2026**

*_s_ashu shukla*
**Ashu Shukla**
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143
