UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

-against-

GAUTAM S. ADANI, SAGAR R. ADANI, VNEET
S. JAAIN, RANJIT GUPTA, CYRIL CABANES,
SAURABH AGARWAL, DEEPAK MALHOTRA,
and RUPESH AGARWAL,

Defendants.

MEMORANDUM & ORDER
24-CR-0433 (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the United States of America by and through R. Trent McCotter of the U.S. Department of Justice (the "Department") moves to dismiss the Indictment with prejudice as against all Defendants: Gautam S. Adani, Sagar R. Adani, Vneet S. Jaain, Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal (collectively, "Defendants").[1] (Dept's Rule 48(a) Mot. to Dismiss Indictment ("Rule 48(a) Mot.") (Dkt. 23).)

For the reasons explained below, the court GRANTS IN PART the Department's Rule 48(a) Motion.[2] Counts Two, Three, and Four of the Indictment as alleged against Defendants Gautam Adani, Sagar Adani, and Jaain (collectively, "Appearing Defendants")

---

[1] All subsequent references to Rules are to the Federal Rules of Criminal Procedure. When quoting cases, unless otherwise noted, all alterations are adopted and all citations, emphases, internal quotation marks, and ellipses are omitted.

[2] Although this case was not formally transferred from the U.S. Attorney's Office for the Eastern District of New York to the Department (as was the case in, for example, *United States v. Adams*, 777 F. Supp. 3d 185, 200 (S.D.N.Y. 2025)), it is clear that the pending Motion is that of the Department alone. For details, see *infra* Section I.F.

1

are DISMISSED WITH PREJUDICE. The court RESERVES JUDG-MENT as to the portions of the Motion regarding Counts One and Five as alleged against Defendants Gupta, Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal (collectively, "Non-Appearing Defendants"), pending the Department's fulfill-ment of Rule 48(a)'s requirements.

## I. BACKGROUND[3]

### A. The Indictment

On October 24, 2024, a grand jury sitting in the Eastern District of New York returned an indictment against Defendants under

---

[3] Unless otherwise noted, the facts below are taken directly from the par-ties' filings in this criminal case and in the related civil enforcement actions also pending before this court: *Securities and Exchange Commission v. Adani et al.*, No. 24-CV-8080 (NGG) (JRC) (the "Adani SEC Action") and *Securi-ties and Exchange Commission et al. v. Cabanes*, No. 24-CV-8081 (NGG) (JRC) (the "Cabanes SEC Action"). Hereinafter, all citations to docket en-tries in the *Adani SEC Action* are cited as "[Document Name] (Dkt. [Docket Number]) in *Adani SEC Action*." The court follows the same convention for citations to docket entries in the *Cabanes SEC Action*.

The filings in these three related cases are not voluminous. Thus, the court exercised its discretion to perform a limited review of the publicly accessi-ble documents referenced or quoted in, but not attached to, the parties' submissions. The court includes these facts here for the sole purpose of providing a complete narrative. However, in deciding the Rule 48(a) Mo-tion, *infra* Section III, the court considers and relies only on the parties' filings in this case. The court does so even though nothing in Rule 48(a) or the relevant case law prevents a court from looking beyond the parties' filings to other publicly available information. *See Adams*, 777 F. Supp. 3d at 208-09; *see also* 3B Charles Alan Wright & Arthur R. Miller Fed. Prac. & Proc. Crim. § 802 n.10 (4th ed. April 2026 Update) (hereinafter "Wright & Miller") ("There is no binding law preventing the court from investigating whether the government's motion to dismiss the indictment was brought in bad faith.").

seal. (Indictment (Dkt. 1).) Arrest warrants for all Defendants were issued later that day.[4] (Arrest Warrants (Dkts. 2-9).)

As alleged in the Indictment, Defendants are all non-U.S. citizens and current or former executives and employees of various business entities with ties to India, the United States, and Canada. Appearing Defendants are senior executives of the India-based conglomerate, the Adani Group. (Indictment ¶¶ 2, 8-10; *see also* Compl. ¶¶ 1-2, 15-20 (Dkt. 1) in *Adani SEC Action* ("Adani SEC Compl.").) At all relevant times, Appearing Defendants were also senior executives of the Group's subsidiary, Adani Green Energy Ltd. ("Adani Green")—a renewable-energy company headquartered in India. (Indictment ¶¶ 2-3, 8-10; Adani SEC Compl. ¶¶ 1-3, 15-16, 18, 20.) Notwithstanding that Adani Green operates in India and is publicly traded on Indian exchanges, the company has received millions (if not billions) of dollars in financing from lenders, banks, and investors in the United States. (Indictment ¶¶ 3, 88, 90, 101, 109, 113; Adani SEC Compl. ¶¶ 18, 127-30.) Non-Appearing Defendant Gupta is the former Chief Executive Officer of Azure Global Power Limited (the "U.S. Issuer")—a renewable-energy company that produces solar power in India, is incorporated in Mauritius, and was a U.S. Issuer with registered securities traded on the New York Stock Exchange until November 2023 that was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") through April 2024.[5] (Indictment ¶¶ 4, 11; Adani SEC Compl. ¶ 21; Compl.

---

[4] As of this Memorandum & Order, the arrest warrants remain outstanding. According to McCotter, that is because Defendants are "all foreign nationals who live abroad in locations that offer no reasonable prospect of arrest." (McCotter Ltr. (Dkt. 37) at 7.)

[5] The Foreign Corrupt Practices Act ("FCPA") defines U.S. Issuer to mean a company with securities registered in the United States. By opting into the U.S. public markets, a U.S. Issuer also opts into certain reporting practices and good governance standards, including not to bribe "any foreign official" for various statutorily defined purposes. 15 U.S.C. § 78dd-1(a).

¶¶ 2, 14 (Dkt. 1) in *Cabanes SEC Action* ("Cabanes SEC Compl.").) Defendant Gupta is also the former Managing Director of the U.S. Issuer's majority-owned and controlled subsidiary, which built and operated renewable-energy projects in India. (Indictment ¶¶ 5, 11.) Non-Appearing Defendant Rupesh Agarwal held various executive positions at both the U.S. Issuer and the U.S. Issuer's subsidiary between 2022 and 2023. (*Id.* ¶ 15.) Non-Appearing Defendants Cabanes and Malhotra are former Directors of the U.S. Issuer and served on its Board of Directors between 2019 and 2023. (*Id.* ¶¶ 12, 14; Cabanes SEC Compl. ¶¶ 1, 13.) Finally, Non-Appearing Defendant Saurabh Agarwal reported to Defendant Cabanes between May 2017 and July 2023. (Indictment ¶ 13.)

The 54-page Indictment details serious accusations of foreign corrupt practices, fraud, obstruction, and conspiracy between 2020 and 2024 in furtherance of three alleged schemes: (1) to pay "approximately $265 million in bribes" to Indian government officials for "lucrative" solar energy contracts with Indian government entities, (the "bribery scheme"); (2) to lie to U.S. and international investors to raise "billions of dollars in financing," (the "fraud scheme"); and (3) to impede the investigations of three U.S. government entities, (the "obstruction scheme"). (*Id.* ¶¶ 1, 49, 135.) As alleged, beginning in 2020, Defendants entered into an agreement to carry out the bribery scheme using the corporate entities identified above; between 2020 and 2024, Appearing Defendants facilitated the bribery payments and then lied to U.S. lenders and investors to keep the payments concealed and secure almost $4 billion in financing; and starting in 2022, Non-Appearing Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal agreed to destroy and suppress evidence and to provide false information to the grand jury, the Federal Bureau of Investigations ("FBI"), and the SEC to ensure that the schemes' objectives were accomplished. (*See id.* ¶¶ 37-

84; *see also* Adani SEC Compl. ¶¶ 1-7; Cabanes SEC Compl. ¶¶ 3-6.)

Based on these allegations, the Indictment charges five counts: (1) Count One: Conspiracy to Violate the Foreign Corrupt Practices Act ("FCPA"); (2) Count Two: Securities Fraud Conspiracy; (3) Count Three: Wire Fraud Conspiracy; (4) Count Four: Securities Fraud; and (5) Count Five: Conspiracy to Obstruct Justice. (Indictment ¶¶ 124-35.) Count One is alleged against Non-Appearing Defendants. (*Id.* ¶¶ 124-26.) Counts Two, Three, and Four are alleged against Appearing Defendants. (*Id.* ¶¶ 127-33.) Count Five is alleged against four of the five Non-Appearing Defendants: Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal. (*Id.* ¶¶ 134-35.)

### B. Subsequent Events

Shortly after the grand jury returned the Indictment, Donald J. Trump was elected President of the United States. On November 6, 2024, Defendant Gautam Adani congratulated the President-elect and posted on X:

> If there is one person on Earth who stands as the embodiment of unbreakable tenacity, unshakeable grit, relentless determination and the courage to stay true to his beliefs, it is Donald Trump. Fascinating to see America's democracy empower its people and uphold the nation's founding principles. Congratulations to the 47th POTUS-elect @realDonaldTrump.[6]

On November 13, 2024, Defendant Gautam Adani congratulated the President-elect again and announced his commitment to invest $10 billion in the United States:

---

[6] Gautam Adani (@gautam_adani), X (Nov. 6, 2024, 12:54 P.M.), https://perma.cc/2PR4-JLN3.

> Congratulations to @realDonaldTrump. As the partner-
> ship between India and the United States deepens, the
> Adani Group is committed to leveraging its global exper-
> tise and invest $10 billion in US energy security and
> resilient infrastructure projects, aiming to create up to
> 15,000 jobs. IN 🩷 US.[7]

On November 20, 2024, the Indictment was unsealed. Then-U.S. Attorney for the Eastern District of New York, Breon Peace; then-Deputy Assistant Attorney General for the Department's Criminal Division, Lisa H. Miller; and then-Assistant Director in Charge for the FBI's New York Field Office, James E. Dennehy announced the charges.[8] The officials touted the securing of the Indictment as an example of the government's "steadfast" commitments to protecting U.S. investors and the integrity of U.S. financial markets, and to prosecuting conduct that "violates U.S. law, no matter where in the world it occurs."[9]

That same day, the SEC filed two civil enforcement actions: one against Appearing Defendants Gautam and Sagar Adani; the other, against Non-Appearing Defendant Cabanes. (Adani SEC Compl.; Cabanes SEC Compl.) The SEC actions involve similar allegations arising from the "same transactions or events" as this criminal case: the Adanis's and Cabanes's alleged participation in the bribery scheme and in the fraud scheme, including their false

---

[7] Gautam Adani (@gautam_adani), X (Nov. 13, 2024, 12:44 P.M.), https://perma.cc/Q3PM-FTRL. This X post is partially quoted in Defendant Gautam Adani's affirmation and in Mr. Giuffra's declaration; both omit Mr. Adani's congratulations to and tagging of President Trump. (G. Adani Aff. (Dkt. 40-1) ¶ 3; Giuffra Decl. (Dkt. 40-2) ¶ 9.)

[8] Press Release, U.S. Atty's Office, E.D.N.Y., *Billionaire Chairman of Conglomerate and Seven Other Senior Business Executives Indicted in Connection with Scheme to Pay Hundreds of Millions of Dollars in Bribes and Conceal Bribery Scheme from U.S. Investors* (Nov. 20, 2024), https://perma.cc/R2UA-LYVB?type=image.

[9] *Id.*

representations to U.S. investors that they and Adani Green had not "paid or promised to pay bribes or sought to unduly influence government officials," they and Adani Green had not "violated applicable antibribery laws," and Adani Green had "rigorous and effective anti-bribery policies and procedures."[10] (SEC Ltr. to Hon. Vera M. Scanlon Dated 12/5/2024 (Dkt. 22-1) at 1; *see also* Adani SEC Compl. ¶¶ 62-88 (bribery), 89-126 (fraud); Cabanes SEC Compl. ¶¶ 35-87 (bribery).)

In December 2024, the two SEC actions were judicially determined to be "related" to this criminal case and assigned to the Honorable Nicholas G. Garaufis.[11]

Despite regular status reports from the SEC, neither the U.S. Attorney's Office nor the Department took any action on the docket in this case between unsealing the Indictment in November 2024 and filing the Rule 48(a) Motion in May 2026. During that time, President Trump took office and his Administration put out new policies for the Department's enforcement of the FCPA.

### C. Intervening Changes to FCPA Enforcement

On February 10, 2025, President Trump signed Executive Order 14209, entitled "Pausing [FCPA] Enforcement to Further American Economic and National Security," (the "Executive Order").[12] In relevant part, the Executive Order directed the Department to

---

[10] According to the SEC complaints, Adani Green, the U.S. Issuer, and their "executives and agents" agreed to, and did, pay the approximately $250 million in bribes to Indian state officials. (Adani SEC Compl. ¶¶ 6, 71-72, 81-86, 131-35; Cabanes SEC Compl. ¶¶ 1-8, 24-87.)

[11] (Text Order Dated 12/12/2024 in *Adani SEC Action*; Order Reassigning Case Dated 12/18/2024 in *Adani SEC Action*; Order Reassigning Case Dated 12/18/2024 in *Cabanes SEC Action*; *see also* SEC's Not. of Request for Judicial Determination that Civil Cases are 'Related' (Dkt. 22).)

[12] Exec. Order No. 14209 § 2, 90 FR 9587 (Feb. 10, 2025) (hereinafter "Exec. Order").

within 180 days: (1) "review in detail all existing FCPA . . . enforcement actions and take appropriate action with respect to such matters"; and (2) "issue updated guidelines or policies" governing FCPA enforcement.[13]

On June 9, 2025, pursuant to the Executive Order, Deputy Attorney General (then, also Acting U.S. Attorney General [14]) Todd Blanche issued a memorandum entitled "Guidelines for Investigations and Enforcement of the [FCPA]," (the "Blanche Memorandum").[15] To "ensure that FCPA investigations and prosecutions are carried out in accordance with President Trump's directive," the Blanche Memorandum reoriented the Department's approach to the FCPA by requiring prosecutors to evaluate four non-exhaustive factors when considering whether to initiate a new FCPA investigation or to pursue an already existing FCPA enforcement action, including this case. (Blanche Mem. at 4.)

---

[13] *Id.*

[14] Blanche was confirmed as U.S. Attorney General on Saturday, August 8, 2026.

[15] Memorandum for Head of the Criminal Division from the Deputy Attorney General on Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (FCPA) (June 9, 2025), https://perma.cc/87LQ-BQ6J (hereinafter "Blanche Mem.").

On August 9, 2025, the Executive Order's 180-day deadline to "review," and "take appropriate action" in, all existing FCPA enforcement actions expired.[16] (*Id.* at 1 (quoting Exec. Order § 2).) The Department took no action to pursue or abandon this case.[17]

### D. The Lead-Up to the Rule 48(a) Motion

In August 2025, Defendant Gautam Adani retained Sullivan & Cromwell LLP ("S&C"). (Giuffra Decl. (Dkt. 40-2) ¶ 1.) Defendant Gautam Adani's attorney Robert J. Giuffra, also serves as personal attorney for President Trump.[18]

Five months later, in January 2026, McCotter—the former Director of the Separation of Powers Clinic at the Catholic University of America's Columbus School of Law—began in the Office of the Deputy Attorney General.[19] (McCotter Ltr. (Dkt. 37) at 6.) He

---

[16] The Executive Order authorized the "Attorney General [to] extend [the] review period for an additional 180 days." Exec. Order § 2(b). Even if then-Acting Attorney General Blanche extended the review period (the court has been given no evidence to believe that he did), the additional 180-day review period would have ended on February 5, 2026—before McCotter filed the Rule 48(a) Motion.

[17] Such action would be taken nearly a year later, when McCotter filed the Rule 48(a) Motion in May 2026.

[18] Erica Orden, *Trump's Personal Law Firm Has a Pipeline to Top DOJ Jobs*, POLITICO (July 12, 2026), https://perma.cc/PW46-XY87; *see also* Abigail Adcox et al., *How Sullivan & Cromwell Has Cemented Itself as Trump's Favored Law Firm*, LAW.COM (June 15, 2026), https://perma.cc/8AA7-ZZL5.

[19] In that role, McCotter submitted an amicus brief in support of the immediate dismissal of the federal indictment against former Mayor of New York City Eric Adams. Br. of *amicus curiae, United States v. Adams*, No. 24-CR-0556 (DEH) (S.D.N.Y. Feb. 26, 2025) (Dkt. 143-1). That brief makes many of the same unsupported arguments found in McCotter's letter to this court. (McCotter Ltr. at 1-5.)

"had never heard of any defendants in this case." (*Id.*) Nevertheless, "[s]ome of the defense counsel requested a meeting to discuss the case and why it should be dismissed." (*Id.*)

McCotter eventually familiarized himself with the case—with tremendous help from counsel for Appearing Defendants. (*See id.* at 6, 9; *see also* Giuffra Ltr. (Dkt. 35) at 3-4 ("The [Department] seeks to dismiss the Indictment after months of detailed and extensive communications and meetings with counsel for [Appearing] Defendants regarding the law and facts governing this case.").)

According to Mr. Giuffra, upon being retained by Defendant Gautam Adani in August 2025, his team spent "many thousands of hours analyzing documents and information related to this case, conducting careful legal analysis of relevant and controlling caselaw, and engaging in extensive and substantive discussions and meetings with representatives of the [Department and] the SEC," regarding the "securities and loan-related allegations" charged in Counts Two, Three, and Four of the Indictment and in the *Adani SEC Action*.[20] (Giuffra Decl. ¶ 5.) Regarding the charges in this case, S&C "submitted approximately 600 pages of law, facts, expert testimony, and argument to the [Department] in ten weeks, between February 3, 2026 and April 17, 2026." (*Id.* ¶ 9.) Specifically, S&C submitted: (1) a 118-page letter, "accompanied by a nine-page cover letter"; (2) a "12-page supplemental submission"; (3) a "95-page slide deck presented in February 2026"; (4) a "copy of a separate 151-page slide deck presented to the SEC in March 2026"; (5) four expert reports from "U.S.

---

[20] S&C also met with the Treasury Department's Office of Foreign Assets Control ("OFAC") regarding a "separate economic sanctions-related investigation involving one of the Adani Group companies [Adani Enterprises]." (Giuffra Decl. ¶ 5); OFAC Settlement Agreement (May 18, 2026), https://perma.cc/3TF9-QPYV (hereinafter "OFAC Settlement").

and Indian subject matter experts, who wrote and submitted another approximately 200 pages of expert reports"; and (6) a final, "35-page slide deck presented in April 2026."[21] (*Id.* ¶¶ 6-7 & n.1.)

According to McCotter, he spent "well over a hundred hours reviewing and debating" S&C's materials, including in "numerous meetings with defense counsel (two of which featured a dozen-plus attorneys) and also separate meetings with only Department counsel." (McCotter Ltr. at 6, 10.) After "conducting" these meetings, reviewing additional materials prepared by "defense counsel and Department counsel in response to [his] questions," and completing his "own research and analysis," McCotter says that he "determined the security [sic] charges should be dropped" and "turned to the FCPA charges." (*Id.* at 6, 8.)

On May 14, 2026, *The New York Times* reported on the Department's plan to dismiss the securities charges.[22] According to McCotter, the story was "unethically leaked" by an unidentified Department attorney and published before "[he] could undertake a full review" of the FCPA charges. (*Id.* at 8.) "Once that story broke," McCotter says that "[he] was contacted by defense counsel for [Non-Appearing] Defendants" who told him that "they would oppose any dismissal of the securities charges [Counts Two, Three, and Four] if the FCPA charges [Count One] were not also dismissed."[23] (*Id.*) McCotter then "continued [his] review of the FCPA charges," including "in several meetings with defense counsel to discuss them." (*Id.*)

---

[21] The parties have not submitted these documents, nor has the court requested them.

[22] Nicole Hong et al., *U.S. Set to Drop Charges Against Indian Billionaire Accused of Fraud*, N.Y. Times (May 14, 2026), https://perma.cc/P52A-6B25.

[23] The court has not heard from counsel for Non-Appearing Defendants, does not know their identities, and does not know the full extent of their advocacy.

Also on May 14, 2026, the SEC filed a motion requesting that this court approve the proposed Consent Judgments it had executed with Defendants Gautam and Sagar Adani to settle the *Adani SEC Action*. (Giuffra Decl. ¶ 14 (citing Consent J. (Dkt. 34) in *Adani SEC Action*).) In the proposed judgments, the Adanis have agreed to pay $18 million in civil penalties, and to be enjoined from certain future U.S. securities law violations, among other settlement commitments.[24] (*Id.*)

### E. The Rule 48(a) Motion

On May 18, 2026, McCotter filed the Rule 48(a) Motion requesting that the court dismiss the Indictment with prejudice. The Motion is signed by McCotter and the current U.S. Attorney for the Eastern District of New York, Joseph Nocella, Jr. In other words, no person involved in bringing the charges signed on to dismiss them.[25]

Unlike the SEC's proposed Consent Judgments, the Department's Rule 48(a) Motion provides no terms of an agreement. Instead, the one-paragraph Motion states only that "the Department of Justice has reviewed this case and has decided, in its prosecutorial discretion, not to devote further resources to these criminal charges against individual defendants."

Also on May 18, 2026, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") announced a Settlement

---

[24] On May 30, 2026, the SEC filed revised proposed Consent Judgments, modified to align with the rescission of SEC Rule 202.5(e), which had required defendants to agree not to publicly deny complaint allegations as a condition of settlement. (Consent Mot. for Settlement Submitting Proposed Revised Final Consent Js. (Dkt. 37) in *Adani SEC Action*.)

[25] Two days after McCotter filed the Rule 48(a) Motion, two Department counsel involved in bringing the Indictment withdrew: Shy Jackson of the Criminal Division, Fraud Section's FCPA Unit and Andrew Tyler of the Fraud Section's Market Integrity and Major Frauds Unit. (Nots. of Withdrawal (Dkts. 24, 25).)

Agreement with the Adani Group's "flagship entity,"[26] Adani Enterprises Limited, in connection with "apparent violations" of the U.S. sanctions against Iran.[27] (Giuffra Decl. ¶ 15 (quoting OFAC Settlement).) In exchange for a $275 million payment, OFAC agreed to "release and forever discharge [Adani Enterprises], without any finding of fault, from any and all civil liability in connection with the apparent violations."[28] (*Id.*)

Between June 17 and 18, 2026, Appearing Defendants appeared through counsel. (Appearances (Dkts. 26-34).) On June 24, 2026, Mr. Giuffra filed a letter on behalf of these Defendants. The letter describes Appearing Defendants' reasons for consenting to the Rule 48(a) Motion. (*See generally* Giuffra Ltr.)

### F.   Subsequent Orders

On June 26, 2026, the court reminded the parties that Rule 48(a) requires the *government* to provide its rationale, including sufficient factual support, for the requested dismissal and directed the Department to fulfill those requirements. (June 26, 2026 Mem. & Order ("June 26 Order") (Dkt. 36).)

On July 4, 2026, in response to the court's June 26 Order, McCotter submitted an unsworn letter. In the letter, McCotter averred that "[he] was the final and sole decisionmaker to seek dismissal of the charges here" and, as such, "[he] did not ask[] the U.S. Attorney or any other attorney to sign this submission." (McCotter Ltr. at 3 n.1, 10 n.3.) The letter also concedes that

---

[26] Adani Enterprises, https://perma.cc/K9W2-4HDB.

[27] OFAC Settlement at 4, 5.

[28] *Id.* While Mr. Giuffra's declaration correctly quotes the Settlement Agreement as stating that Adani Enterprises "extensively cooperated with OFAC's investigation," the full quotation also states that "OFAC determined that [Adani Enterprises]'s conduct was egregious" and that "its submissions did not constitute a voluntary self-disclosure under the Enforcement Guidelines." *Compare* (Giuffra Decl. ¶ 15), *with* OFAC Settlement at 1.

"current or former Department attorneys may disagree with the decision to drop these charges." (*Id.* at 10.)

Although directed to provide only the reasons for the requested dismissal, (June 26 Order at 1), McCotter also volunteered his so-called "non-considerations," (McCotter Ltr. at 9). Specifically, the letter states that McCotter did not consider "some promise" by Defendant Gautam Adani to "invest money in the United States" in exchange for the dismissal of this case. (*Id.*) According to McCotter, before the investment promise "first arose" in his meetings with defense counsel, he had already "firmly concluded" that he "would seek dismissal of the securities charges no matter what." (*Id.*)

Introducing this "non-consideration," McCotter's letter refers to "stories in the media about the Department's motion to dismiss the securities charges in this case." (*Id.*) Here, the letter appears to be referring to articles reporting on the "transactional nature" of the Department's request to drop this case,[29] potential "influence-peddling" from personal attorneys to the President

---

[29] *See, e.g.*, Hong et al., *supra* note 22; Dan Rosenzweig-Ziff et al., *Trump Administration Ends Civil, Criminal Cases Against Adani After $10 Billion Investment Promise*, Reuters (May 18, 2026), https://perma.cc/824X-FHF5; Economic Times, *Adani Group Will Start Business in Big Way in US Because Allegations Have Been Withdrawn: Senior Advocate HP Ranina* (May 19, 2026), https://perma.cc/PB32-2EPT; Bloomberg Law, *Adani Group Secures $15 Billion Capital as US Legal Clouds Clear* (July 3, 2026), https://perma.cc/HBN4-MG6B ("In one week, billionaire Gautam Adani has announced nearly $15 billion in investment commitments. . . . The string of announcements signals that the [G]roup . . . is rapidly regaining ground with investors, including US-based banks.").

Many of these reports also formed the basis for a June 11, 2026 letter from U.S. Senators Elizabeth Warren and Richard Blumenthal to then-Acting Attorney General Blanche about the Department's decision to drop this case that raises "serious questions" about "the role that Mr. Adani's politically salient offer played in the DOJ's decision." U.S. Senate, Ltr. to Acting Att'y

including Mr. Giuffra and Mr. Boris Epshteyn,[30] and reported meetings between Defendant Gautam Adani and the President's eldest son, Donald Trump Jr., as early as November 2025.[31]

Concerned about the specter of a financial promise first raised in McCotter's unsolicited references to news articles, the court directed Defendant Gautam Adani to answer whether any agreement or promise exists in connection with the Department's dismissal decision. (July 8, 2026 Order ("July 8 Order") (Dkt. 38) at 3-4.)

On July 15, 2026, Mr. Giuffra submitted the requested affidavit, and an unsolicited declaration of his own. (G. Adani Aff. (Dkt. 40-1); Giuffra Decl.)

In his affidavit, Defendant Gautam Adani swore that "[he is] not aware of anything promised, offered, sought, received, agreed to, or accepted by anyone in connection with the dismissal of the Indictment." (G. Adani Aff. ¶ 2.) Notwithstanding this affirmation, Mr. Adani disclosed that during "settlement discussions" with the Department and SEC "[his] counsel *suggested* that [his] publicly stated intent to invest $10 billion in the United States might be part of a resolution . . . *if* that was what the DOJ or SEC wanted." (*Id.* ¶ 4 (emphases added).) Defendant Gautam Adani

---

General Todd Blanche re Adani, at 1 (June 11, 2026), https://perma.cc/V3YS-2K7D. As of the writing of this Memorandum & Order, the Department has not responded to the Senators' letter.

[30] *See, e.g.,* Joe Palazzolo et al., *Trump's Personal Lawyer Was Said to Be Part of a Billionaire's Criminal Defense,* Wall St. J. (June 15, 2026), https://perma.cc/NSB6-WTPZ; Gabe Kaminsky et al., *This Law Firm Has Deep Ties to Trump. A Partner Is His Pick to Be Manhattan's Top Prosecutor.,* CBS News (June 17, 2026), https://perma.cc/LN6H-3NYT; *see also* Adcox et al., *supra* note 18.

[31] *See, e.g.,* P R Sanjai et al., *Billionaire Adani Met Trump Jr. While Facing US Bribery Charges,* Bloomberg (June 23, 2026), https://perma.cc/7DJU-ED6G.

swore that "he also understand[s] that the [Department] later informed [his] counsel that it would not consider this potential investment in determining whether to seek dismissal of the Indictment." (*Id.*)

In his declaration, Mr. Giuffra volunteered that "[o]n two occasions during [his] discussions with the [Department], [he] stated that as part of any resolution . . . on the merits, the Adani Group [a non-defendant] would be amenable to following through on a public statement by Gautam Adani regarding the Group's willingness to invest $10 billion in the United States as a means of promoting the U.S.-India trade relationship." (Giuffra Decl. ¶ 9.) Mr. Giuffra also claimed to volunteer the *Department's* purported response to those offers, stating that "in a May 11, 2026 email to [him]," copying McCotter and Assistant Attorney General Tysen Duva, U.S. Attorney Nocella "advised":

> [T]he portion of the joint defense offer made by [Appearing Defendants] to resolve the criminal charges against them by, in part, a general proposal to invest $10 billion in the United States is categorically rejected by **this Office.**

> We understand that other grounds for resolution of the pending criminal charges with the **Department of Justice** are being explored. However, please know that the above-referenced proposal, which appeared in your April 17, 2026, slide deck presentation, will not be considered by **this Office.**

(*Id.* ¶ 12 (emphases added) (quoting Nocella Email Dated 5/11/2026 ("Nocella Email") (Dkt. 46-1).)

Given that U.S. Attorney Nocella's email appeared to draw distinctions between his Office and the Department and each entity's reasons for any possible resolution of the charges in this case, and that in the only evidence before the court, U.S. Attorney

Nocella (as opposed to McCotter) "categorically rejected" Mr. Giuffra's offer of a financial promise on behalf of his Office (as opposed to the Department), the court asked U.S. Attorney Nocella to provide his sworn assurances that the reasons advanced by McCotter for the requested dismissal are all of the real grounds upon which the Rule 48(a) Motion is based.[32] (July 15, 2026 Order ("July 15 Order") (Dkt. 45) at 4-5).

On July 17, 2026, U.S. Attorney Nocella submitted his declaration. Therein, he explained that as a U.S. Attorney "[he] report[s] to the Office of the Deputy Attorney General," and that "McCotter is [his] direct supervisor." (Nocella Decl. (Dkt. 47) ¶ 1.) U.S. Attorney Nocella also swore that after several meetings (including meetings that he attended), McCotter "exercised his authority as PADAG and determined that further resources should not be deployed in this prosecution and that the [I]ndictment should be dismissed."[33] (*Id.* ¶ 2, 3.) U.S. Attorney Nocella confirmed that: "[he] was not the decisionmaker for the motion to dismiss"; "had no participation in drafting the McCotter Letter"; "[his] signing the [Rule 48(a) Motion]" was "at the direction" of McCotter; and thus, "[he has] no basis to believe that the reasons advanced by McCotter for the proposed dismissal are not the real grounds upon which the [Motion] is based." (*Id.* ¶¶ 5-7.)

---

[32] Such assurances were necessary under Rule 48(a) for the reasons explained in the court's July 15 Order. The requested information was also important given that if an individual (in this case, McCotter) "seeks to dismiss a case for improper reasons, a court can deny the motion and send the matter back to the government, which can then reassign the case to another prosecutor." *Adams*, 777 F. Supp. 3d at 192. But, if the "reasons for dismissal [are] offered by the Justice Department itself," the court "cannot force" the Department to prosecute the case. *Id.*

[33] McCotter was appointed Principal Associate Deputy Attorney General, or "PADAG," on April 9, 2026. Acting AG Todd Blanche, (@DAGTodd-Blanche), X (Apr. 9, 2026, 5:22 P.M.), https://perma.cc/MJ6E-BJZ4.

## II. LEGAL STANDARD

Among the three coequal branches, the Executive has the "exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Thus, the Supreme Court has "repeatedly emphasized that 'whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting *United States v. Batchelder*, 442 U.S. 114, 124 (1979)). But after these decisions are made, and the grand jury returns an indictment, "the prosecution is no longer entirely within the realm of . . . [E]xecutive authority." *United States v. Stevenson*, 425 F. Supp. 3d 647, 651 (S.D. W. Va. 2018); *see also id.* at 651 n.31 (observing that "the prosecutor's discretion to dismiss a charge" is "less than absolute once the grand jury has returned a true bill"). This is true because of the "obvious distinction" between the "commencement of a criminal case by the filing of charges" and the "termination of a criminal case by moving to dismiss those charges" pursuant to Rule 48(a). *United States v. Abreu*, 747 F. Supp. 493, 500 (N.D. Ind. 1990), *aff'd sub nom. United States v. Vasquez*, 966 F.2d 254 (7th Cir. 1992).

### A. Rule 48(a)'s Purpose and History[34]

Rule 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment." Fed. R. Crim. P. 48(a).

When it was enacted in 1944, Rule 48(a) "change[d] existing law." Fed. R. Crim. P. 48(a) advisory committee's note to 1944 adoption 1. Prior to the Rule's enactment, the law allowed for the automatic dismissal of an indictment upon the government's motion. *Id.* In contrast, under the current Rule, the government may

---

[34] For additional details regarding Rule 48(a)'s history, see *Adams*, 777 F. Supp. 3d at 205 & n.24.

dismiss an indictment "only *by leave of court*." *Id.* (emphasis added); *see also United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975) ("The Supreme Court's deliberate insertion of the phrase 'by leave of court,' the phrase itself denoting judicial choice, . . . [was] intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice."); *Rinaldi v. United States*, 434 U.S. 22, 34 (1977) (adding that the addition of the "leave of court" proviso seems "clearly directed toward an independent judicial assessment of the public interest in dismissing the indictment") (Rehnquist, J., dissenting). In the words of the Second Circuit, Rule 48(a) does not "shift absolute power from the Executive to the Judicial Branch." *United States v. Blaszczak*, 56 F.4th 230, 240 (2d Cir. 2022). Instead, Rule 48(a) gives the court, "a power to check [Executive] power." *Id.*; *see also Cowan*, 524 F.2d at 513 ("Rule 48(a) was intended to modify and condition the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives.").

While the Supreme Court "did not publicly explain its rationale for adding the 'leave of court' requirement," *United States v. Adams*, 777 F. Supp. 3d 185, 206 (S.D.N.Y. 2025) (citing *Rinaldi*, 434 U.S. at 29 n.15), according to Wright & Miller, "evidence suggests the addition of the requirement for court approval prior to a dismissal was motivated by a concern that prosecutors were seeking dismissals of politically well-connected defendants." Wright & Miller § 802 n.2.50; *see also United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973) (observing that Rule 48(a) "contemplates exposure of the [government's] reasons for dismissal in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors").

Regardless of the motivations for the Rule's adoption, the Supreme Court has recognized that the "leave of court" requirement

19

"obviously vest[s] some discretion in the court." *Rinaldi*, 434 U.S. at 29 n.15. This discretion is narrow, yet critical. "Rule 48(a) is meant to be a check on the abuse of executive prerogatives." *United States v. B.G.G.*, 53 F.4th 1353, 1362 (11th Cir. 2022). To achieve this purpose, Rule 48(a) gives the courts the power to "guard against [the] abuse of prosecutorial discretion." *United States v. Amos*, 763 F. Supp. 3d 2, 4 (D.D.C. 2025) (quoting *Ammidown*, 497 F.2d at 620); *see also Adams*, 777 F. Supp. 3d at 207 (same). Thus, the Rule "asks courts to strike a delicate balance— deferring to executive discretion where appropriate but protecting against executive overreach in limited circumstances." *Adams*, 777 F. Supp. 3d at 207.

### B. Rule 48(a)'s Requirements

The court's role on a Rule 48(a) motion is, of course, distinctly judicial: to ensure the Executive satisfies the Rule's "procedural and substantive components." *Id.* at 207 (citing *Ammidown*, 497 F.2d at 620). Critically, "whether a defendant consents to dismissal is not dispositive." *Id.* (citing *United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981)). Instead, a court may deny dismissal "even when the defendant consents to the motion." *Hamm*, 659 F.2d at 629.

"Rule 48(a) requires that the government set forth the basis for its motion to dismiss." *Adams*, 777 F. Supp. 3d at 208 (collecting cases). Thus, to satisfy the Rule's procedural components, the court will first "require" the government to provide a "statement of reasons and underlying factual basis" for its dismissal determination. *Id.* at 207 (quoting *Ammidown*, 497 F.2d at 620). Here, an "'unsupported conclusory reason' for seeking dismissal" is insufficient. *Id.* at 208 (quoting *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982)); *see also United States v. Olmos-Gonzales*, 993 F. Supp. 2d 1234, 1236 (S.D. Cal. 2014) (denying Rule 48(a) motion where the government provided only one conclusory reason for dismissal without further justification or any

factual basis). Instead, the government must provide both its actual reasons for the requested dismissal and "sufficient factual information" for the court to be sure that the proffered reasons are the real reasons for dismissal. *Adams*, 777 F. Supp. 3d at 208 (first quoting Wright & Miller § 802; and then citing *United States v. Rosenberg*, 108 F. Supp. 2d 191, 208 (S.D.N.Y. 2000) as an example).

After the court is satisfied that it has sufficient factual support for all of the "real" reasons for the dismissal, it turns to Rule 48(a)'s substantive components. *Id.* at 207-08 (citing *Ammidown*, 497 F.2d at 620). At this stage, the court must "be satisfied" that the government's sufficiently supported, real reasons for dismissal are also "substantial." *Id.* at 208 (quoting *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964)). In doing so, the court does not "substitute its judgment for that of the prosecutor." *Id.* at 206-07 (quoting *United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989)).

Regardless of whether the Government requests dismissal with or without prejudice, the court "retains discretion to determine whether a dismissal should be with or without prejudice." *Id.* at 214.

## III. DISCUSSION

It is evident throughout McCotter's musings on "judicial inquisitions," the "separation of powers," and "prosecutorial discretion" that he would like the court to have no role in reviewing this Motion. (McCotter Ltr. at 1-5.) However, the Rule's legislative history and relevant case law confirm that Rule 48(a) was enacted to ensure the court's limited, but key, role in scrutinizing the government's decision to dismiss charges once a grand jury returns an indictment. *Supra* Section II.

As explained in the court's prior orders, McCotter filed a procedurally inadequate Rule 48(a) motion.[35] In response to those orders, the court now has before it: (1) the Department's proffered statement of reasons for dismissal in the form of McCotter's unsworn letter dated July 4, 2026, (Dkt. 37), which attaches three, unauthenticated decisions from the Competition Commission of India dated April 16, 2026, the High Court of Delhi at New Delhi dated March 10, 2026, and the High Court of Judicature at Bombay, Criminal Appellate Jurisdiction dated March 27, 2026, (Dkts. 37-1, 37-2, 37-3); (2) Defendant Gautam Adani's affidavit dated July 14, 2026, (Dkt. 40-1); (3) Mr. Giuffra's unsolicited declaration dated July 14, 2026, (Dkt. 40-2); (4) a copy of an email from U.S. Attorney Nocella to Mr. Giuffra and others dated May 11, 2026, (Dkt. 46-1); and (5) U.S. Attorney Nocella's declaration dated July 17, 2026, (Dkt. 47).

Having reviewed these submissions, the court is now convinced that McCotter was, in fact, the "sole decisionmaker" with regard to the requested dismissal. On the evidence before it, the court is also satisfied that Defendant Gautam Adani's $10 billion investment promise was, in fact, a "non-consideration," and that the reasons for dismissal enumerated on pages 6-9 of McCotter's letter are the real reasons for his decision to dismiss the Indictment.

The court can now proceed to determine for each reason (a) whether the government has provided "sufficient factual information," and if so, (b) whether that particular reason is "substantial." *Adams*, 777 F. Supp. 3d at 208.

---

[35] McCotter's statement that "the Department typically files short dismissal motions, which [c]ourts typically accept without controversy," (McCotter Ltr. at 5), is inaccurate. As just one example, on July 31, 2026, the Department filed a 20-page motion complete with evidentiary exhibits supporting the reasons for dismissal. Dept's Mot. to Dismiss Indictment, *United States v. David Hearn*, No. 2026 CF2 10237 (TEE) (D.C. Super. Ct. July 31, 2026).

### A. The Proffered Reasons for Dismissal

McCotter's letter enumerates six "overlapping bases" for the requested dismissal. (McCotter Ltr. at 6.) According to McCotter, "any one" basis would be "sufficient" to grant the Department's requested dismissal of all charges against all Defendants and "taken together," the six bases "ma[k]e clear the entire case must be dismissed." (*Id.*)

Following these purported "overlapping" bases to dismiss "all charges," McCotter separates the charges into "two buckets": (1) the securities and fraud charges brought in Counts Two, Three, and Four; and (2) the FCPA and obstruction charges brought in Counts One and Five, respectively. (*Id.*) For each bucket, McCotter provides a list of "charge-specific" bases for dismissal. (*Id.* at 7-8 (providing "additional" bases for dismissal of Counts Two, Three, and Four), 8-9 (providing "additional" bases for dismissal of Count One), 9 (providing "additional" bases for dismissal of Count Five).)

Having carefully considered each basis, the court concludes that the Department has met Rule 48(a)'s requirements as to one proffered reason justifying the dismissal of Counts Two, Three, and Four of the Indictment.

#### 1. The "Overlapping" Bases for Dismissal

As explained below, none of McCotter's "overlapping" bases for dismissal provide any factual basis for his decision to end this prosecution. (*See* McCotter Ltr. at 6-7.) Additionally, even a cursory review reveals that several of these so-called "overlapping" bases do not in fact overlap between all Counts.

##### a. *"This is a foreign case."*

McCotter's first reason to dismiss all Counts against all Defendants is that "this is a foreign case," ("Overlapping Basis 1"). (*Id.* at 6.) As support for Overlapping Basis 1, McCotter's letter directs

the court to the Indictment, stating: "Ctrl-F 'India' in the [I]ndictment, and it'll show well over 200 hits." (*Id.*)

McCotter's letter fails to provide the court with sufficient factual information to support Overlapping Basis 1. That the word "India" appears in the Indictment 226 times does not establish that this is a "foreign" case. By that logic, the fact that the term "United States" appears 108 times in the Indictment, or that "U.S. Issuer" returns an independent 110 hits, may well render this a *domestic* case. McCotter's letter therefore provides no factual basis on which to conclude that this is, in fact, a foreign case.[36]

The court is unpersuaded by McCotter's unsworn statements regarding hypothetical concerns of "diplomatic strife" and "waste[d] resources," or his unsubstantiated claim that "India can better manage its internal systems than can prosecutors in Brooklyn and Washington." (*Id.*)

Additionally, Overlapping Basis 1 entirely fails to contend with the conduct that took place *in the United States*—most notably, the Overt Acts of Defendants Cabanes and Saurabh Agarwal, among others, charged in Count One, (Indictment ¶ 126), and the alleged lies Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal, among others, told FBI, SEC, and Department officials *in New York*, (*id.* ¶ 78), which form the basis, in part, of the obstruction charges in Count Five. Thus, even if the Department had met Rule 48(a)'s procedural requirements for Overlapping Basis 1 (it has not), this first "overlapping" reason for dismissal would provide no basis to dismiss either Count One or Count Five.

---

[36] In addition, the lack of any explanation for the legal relevance of McCotter's characterization of this case as "foreign" is particularly stark given the nature of the case, which is prosecuting *foreign* corrupt practices.

Without more, this first proffered reason for dismissal amounts to an unsupported, conclusory statement that does not satisfy Rule 48(a)'s procedural requirements. Therefore, the court will not consider whether Overlapping Basis 1 is a substantial reason for dismissing all Counts.

### b. "[India] has found no actionable conduct."

McCotter's second reason to dismiss all Counts is that "India has investigated many of the allegations in this case and in several reports and decisions issued in 2026 has found no actionable misconduct," ("Overlapping Basis 2"). (McCotter Ltr. at 6.) As support for Overlapping Basis 2, McCotter's letter directs the court to three "attached documents from India" that he "reviewed" before filing the Rule 48(a) Motion. (*Id.*) However, unauthenticated foreign legal documents are insufficient to satisfy the court's oversight obligations under Rule 48(a). Further, inspection of the documents reveals that they do not provide support for, and instead contradict, McCotter's characterization of their contents.

First, the unauthenticated foreign legal documents are irrelevant. India's laws are not this country's laws. It is obvious that the court cannot discharge its Rule 48(a) duty to review the Department's reasons for dismissal by relying solely on "reports and decisions" from foreign tribunals applying foreign laws in foreign judicial systems. (*Id.*) Whatever determinations India's tribunals may have made under India's legal standards about *some* of the alleged conduct in this case (explained below), has no bearing on whether all Counts against all Defendants should be dismissed under the criminal laws of the United States in *this* case.

Second, putting aside their irrelevance, the documents provide no support for McCotter's claims that India has "investigated many of the allegations in this case" and that India has "found no actionable misconduct." (*Id.*) Not one of the documents appears

25

to be the result of an investigation—by India or anyone else. Rather, each document appears to be a decision by an Indian government authority *not* to investigate. Not one of the documents meaningfully contends with the allegations in this case. In fact, the allegations—in each case, brought by a private individual—bear very little resemblance (if any) to the alleged conduct in the Indictment. Finally, no document concludes that nothing "inappropriate" happened. (*Id.*)

The Competition Commission of India decided not to investigate a private individual's claims about possible collusion between 12 named parties in the "generation and distribution of solar power" in India in violation of India's Competition Act of 2002. (Competition Comm'n Decision ¶¶ 25, 59). The crux of the complaint before the Commission was that the Adani Group "abused their market dominance" in the "power generation market in India." (*Id.* ¶¶ 7, 51-52.) No industry collusion is alleged in the Indictment. The only overlap with this case appears to be the private "Informant['s]" attempt to support his case with the Indictment's existence. (*Id.* ¶¶ 7-8.) In that regard, the Commission appears to have concluded that the allegations of bribery in the Indictment "[do] not seem to qualify" as violations of India's Competition Act. (*Id.* ¶ 54.)

The New Delhi High Court declined to accept a private individual's invitation to investigate "grave irregularities" in the "competitive bidding process for solar power projects" under India's Public Interest Litigation jurisdiction. (New Delhi Decision ¶¶ 1-2, 24-25.) No allegations of bribery, securities fraud, or wire fraud were made or investigated. The only overlap between the New Delhi High Court action and this case is the existence of the Indictment—again, used by the private claimant as an attempt to bolster his private claim. (*Id.* ¶ 9.)

The Bombay High Court declined to investigate a private petitioner's claims "relating to the offence of bribery as disclosed by

[petitioner]." (Bombay Decision ¶ 1.) Again, the only apparent overlap with this case is the petitioner's invocation of the Indictment's existence. (*Id.* ¶ 3.) Relying in part on the New Delhi High Court's decision not to investigate, the Bombay High Court dismissed the request to investigate. (*Id.* ¶¶ 4, 5, 9.)

Not one of these documents says anything about either Appearing Defendants's alleged lies and omissions to lenders and investors in the United States, or Non-Appearing Defendants' alleged destruction of evidence and lies to federal officials in New York.

For the above reasons, McCotter's purported factual support for Overlapping Basis 2 is merely an unsupported conclusory statement. Therefore, Rule 48(a)'s procedural requirements are not met as to this second reason to dismiss all Counts.

### c. "Not a single penny has ever been lost."

McCotter's third reason to dismiss all Counts is that "[n]ot a single penny has ever been lost on the securities at issue," ("Overlapping Basis 3"). (McCotter Ltr. at 6.) As support, McCotter's letter provides his unsworn, unsubstantiated assurance that "[t]wo of the notes are fully paid back, and the other two notes are currently paid up, with no indication of any change ahead." (*Id.*)

McCotter gives the court no way to evaluate the veracity of his statement. He also provides no legal standard or argument as to why the purported lack of financial loss supports his dismissal decision. Indeed, the assertion that "[n]ot a single penny has ever been lost on the securities at issue" appears to be entirely immaterial to the allegations giving rise to either the FCPA charges in Count One or the obstruction charges in Count Five—charges that do not require financial loss. *See* 15 U.S.C. § 78dd-1(a); 18 U.S.C. § 1512(c).

The lack of any factual support for this so-called "overlapping" reason for dismissal fails to satisfy Rule 48(a)'s procedural requirements. Therefore, the court will not consider whether Overlapping Basis 3 is a substantial reason for dismissing all Counts.

### d. "[Prior] Department leadership . . . dropp[ed] a potential quagmire of a case into the lap of the incoming Administration."

McCotter's fourth reason to dismiss all Counts is that the Indictment was "unsealed in the final days of the prior Administration, apparently as a 'name and shame' designed to levy accusations without any realistic prospect of a trial ever occurring," ("Overlapping Basis 4"). (McCotter Ltr. at 6.) As support, McCotter asserts that at the time the Indictment was unsealed in November 2024, Department leadership was "surely aware" that "they were dropping a potential quagmire of a case into the lap of the incoming Administration, and perhaps that was an intentional choice." (*Id.*)

McCotter's unsworn, unsubstantiated statement about the prior administration's motives for unsealing the Indictment does not amount to sufficient factual support for Overlapping Basis 4. At most, it provides the court with McCotter's opinions about the integrity of the SEC, FBI, Department, and U.S. Attorney's Office officials who investigated and ultimately brought this case. McCotter appears to be accusing officials across four different government offices of bringing a detailed 54-page, 5-count indictment out of spite. However, he has not provided a scintilla of evidence to suggest that the timing of the unsealing of the Indictment, or the charging decisions, in this case was politically motivated.

McCotter's baseless assertion is unbecoming of his office. It is also inconsistent with this court's experience. The court has presided

over innumerable cases brought by the SEC, the FBI, the Department, and the U.S. Attorney's Office over the last 26 years (and counting) and does not agree with McCotter's characterization of their integrity and motives.

Rule 48(a) requires more than unsubstantiated accusations. It demands sufficient proof. Here, there is simply no evidence to support Overlapping Basis 4. Without any factual support, this fourth reason for dismissal amounts to nothing more than an unsupported conclusory statement that does not satisfy Rule 48(a)'s requirements.

### e. "Extraordinary proof problems"

McCotter's fifth reason to dismiss all Counts is that there "would have been extraordinary proof problems in this case," ("Overlapping Basis 5"). (McCotter Ltr. at 7.) As support, McCotter's letter provides one unsworn and unsubstantiated statement: that "significant evidence and key witnesses are in India." (*Id.*)

Overlapping Basis 5 is entirely speculative. McCotter writes that there *would* have been "extraordinary proof problems" in this case, not that such problems actually exist. McCotter also offers the court no way to evaluate the extent or veracity of his assertions. Furthermore, contrary to McCotter's statements that this basis "would have been sufficient" to justify the dismissal of all Counts, the Indictment suggests otherwise. (*Id.* at 6.) Specifically, McCotter's letter fails to explain how the supposed "proof problems" justify the dismissal of the obstruction charges in Count Five—charges that rest on alleged conduct that occurred, and evidence that presumably exists, in the United States.

McCotter fails to provide sufficient factual support for Overlapping Basis 5. Therefore, this fifth "overlapping" reason for dismissal amounts to an unsupported conclusory statement that does not satisfy Rule 48(a)'s procedural requirements.

> f.  *"[D]efendants have never appeared and probably never would."*

McCotter's sixth reason to dismiss all Counts is that Defendants have "never appeared and probably never would," ("Overlapping Basis 6"). (McCotter Ltr. at 7.) As support for this basis, McCotter's letter states, in full:

> [Defendants] are all foreign nationals who live abroad in locations that offer no reasonable prospect of arrest. That also means that, 18 months after indictment, no proceedings have taken place. There should have been no judicial concern about dismissing a case that has never proceeded past an indictment.

(*Id.*)

McCotter provides no way for the court to assess Overlapping Basis 6, nor the purported factual support on which it relies. McCotter's assertion that Defendants "live abroad in locations that offer no reasonable prospect of arrest" is completely unsubstantiated, and the record provides no information regarding Defendants' whereabouts. (*Id.*)

Moreover, the fact that Defendants have not *yet* appeared says nothing about whether Defendants will appear in the future. In this court's 26 years on the bench, it has seen various instances in which criminal defendants who failed to initially appear, ultimately appeared—sometimes more than 18 months after the indictment had been filed. On the current record, the court cannot be persuaded that a defendant's unwillingness to appear in court thus far provides a real and substantial basis for the dismissal of all pending criminal charges against him.

For the above reasons, Overlapping Basis 6 does not satisfy Rule 48(a).

### 2. The "Charge-Specific" Bases for Dismissal

Having found that McCotter has not satisfied Rule 48(a)'s procedural requirements for Overlapping Bases 1-6, the court assesses each of his proffered "charge-specific" reasons for dismissal—determining for each reason (a) whether the government has provided sufficient factual support, and if so, (b) whether that particular reason is substantial.

### a. *Fraud Charges Against Appearing Defendants (Counts Two, Three, and Four)*

The Indictment identifies four "Fraudulent Financial Transactions": (1) the "2021 Syndicate Loan"; (2) the "2021 144A Bond"; (3) the "2023 Syndicate Loan"; and (4) the "2024 144A Bond," (collectively, the "Transactions"). (Indictment ¶¶ 85, 91, 106, 110.) The Transactions map onto each Count as follows: Count Two charges Securities Fraud Conspiracy relating to both 144A Bonds; Count Three charges Wire Fraud Conspiracy relating to all four Transactions; and Count Four charges Securities Fraud relating only to the 2021 144A Bond. (McCotter Ltr. at 7-8.)

McCotter lays out three "charge-specific" reasons to dismiss these Counts: (1) that the securities charges would face "significant legal risks" given the "jurisdictional limits" of the relevant securities laws because the alleged misconduct "occurred almost entirely in India," (the "Extraterritoriality Rationale"); [37] (2) that the charges would likely fail as "non-actionable expressions of puffery and corporate optimism" because the alleged false statements

---

[37] While McCotter refers to the "jurisdictional limits" of the U.S. securities laws, (McCotter Ltr. at 7), the Supreme Court has explicitly ruled that the "extraterritorial reach of § 10(b)" does not raise "a question of subject-matter jurisdiction" but is, instead, "a merits question." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 250-51, 253, 254 (2010) (Scalia, J.).

"consisted primarily" of "platitudes about following laws, not being bribers, and being upstanding," (the "Non-Actionable Puffery Rationale"); and (3) that it "would have been difficult to prove that [the] ultra-sophisticated investment entities were tricked," because the Transactions "were first transferred to highly sophisticated foreign-owned underwriters, which in turn sold them to qualified institutional buyers," (the "Sophisticated Investor Rationale").[38] (*Id.* at 7-8.)

Of these Rationales, only the Non-Actionable Puffery Rationale is both supported by sufficient factual information and substantial enough to satisfy Rule 48(a)'s requirements.

i.    The Extraterritoriality Rationale

The Extraterritoriality Rationale appears to argue that Counts Two and Four should be dismissed because the alleged misconduct is beyond the geographic reach of Section 10(b) of the Securities Exchange Act of 1934. Relying solely on the Indictment's allegations, McCotter argues that the "limited connections to the United States would pose a substantial risk both at trial and on appeal" because the allegedly fraudulent transactions are unlikely to be found sufficiently "domestic" in the Second Circuit. (McCotter Ltr. at 7.) In other words, the Extraterritoriality Rationale appears to argue that the securities charges amount to a so-called "foreign-cubed" case of the kind addressed by the Supreme Court in *Morrison v. National Australia Bank Limited*, 561 U.S. 247 (2010), and then by the Second Circuit in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).

---

[38] In contrast to the two other Rationales, the Sophisticated Investor Rationale does not purport to cite the record, nor does it provide a single case in support of its legal validity. McCotter's efforts to comply with Rule 48(a)'s procedural components as to the Rationale are therefore lacking. However, the court need not reach the Sophisticated Investor Rationale because it grants the Rule 48(a) Motion as to Counts Two, Three, and Four on the Non-Actionable Puffery Rationale.

In *Morrison*, the Supreme Court addressed the proliferation of private securities actions in U.S. courts brought by (1) foreign purchasers (non-U.S. plaintiffs), against (2) foreign issuers (non-U.S. defendants), based on (3) foreign trades (sales or purchases executed on non-U.S. exchanges)—so-called foreign-cubed (or "f-cubed") transactions. The Court held that Section 10(b) does not provide a cause of action for these f-cubed transactions. *Morrison*, 561 U.S. at 267. Instead, the Court concluded that the provision applies "only" to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.*; *see also Absolute Activist*, 677 F.3d at 66 (same). The Court further clarified that "[w]ith regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales." *Morrison*, 561 U.S. at 268 (emphases in original); *see also Absolute Activist*, 677 F.3d at 66 (same). The Second Circuit clarified the meaning of these "domestic purchases and sales" in *Absolute Activist*, holding that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." 677 F.3d at 66-67. Parties "incur irrevocable liability in the United States" when they "become bound to effectuate the transaction" or "enter[] into a binding contract to purchase or sell securities" in the United States. *Id.* at 67; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016) (same).

McCotter's letter does not provide sufficient factual support for his argument that the Transactions would not qualify as "domestic," (McCotter Ltr. at 7), because the Indictment explicitly contradicts McCotter's unsupported assertions. The Indictment alleges that in effecting the Transactions, "investors **irrevocably committed themselves in the United States** to invest millions of dollars in the securities of [Adani Green]," and that Appearing Defendants relied on the U.S. financial system to perpetuate the

alleged fraud scheme by "**securing investors**" who were "**physically located in the United States.**" (Indictment ¶¶ 39, 41 (emphases added).) The Indictment also includes other allegations further suggesting that the Transactions were effectuated, the binding contracts were entered into, and/or title to the securities passed, in the United States. (*See, e.g., id.* ¶¶ 80, 88, 91, 101, 110.)

On the face of the Indictment, the only facts in the record contradict McCotter's assertion that the Transactions were not "domestic." Therefore, he has not provided sufficient factual information for his claim that the fraud charges present "significant legal risks" under the law of this circuit. (McCotter Ltr. at 7.)

ii.    <u>The Non-Actionable Puffery Rationale</u>

The Non-Actionable Puffery Rationale presents a legal argument to dismiss the fraud charges in Counts Two, Three, and Four, relying on the allegations in the Indictment for factual support. Specifically, McCotter asserts that the "legal theory for fraud here is so broad that it arguably turns any undisclosed corporate misconduct into criminal securities fraud." (*Id.*) He further asserts that the "allegedly false statements" charged in the Indictment "consisted primarily—perhaps exclusively—of platitudes about following laws, not being bribers, and being upstanding," which he avers are the types of statements that the Second Circuit has found to be "inactionable puffery." (*Id.* at 7-8 (citing *Boston Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-CV-0940, 2024 WL 4023842, at *3 (2d Cir. Sept. 3, 2024) (summary order)).)

To succeed in criminal fraud cases, the government must prove beyond a reasonable doubt that the alleged misrepresentations are "material." Materiality is an element of both securities fraud (Counts Two, Four) and wire fraud (Count Three). Under Section 10(b), a statement is "material" if it creates a "substantial likelihood that a reasonable investor" would rely on the statement in deciding "whether to buy or sell" the securities at issue.

34

*Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Under Section 1343, a statement is "material" if it "would naturally tend to lead or is capable of leading a reasonable person to change [their] conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). Under either standard, a statement "too general" to cause reasonable reliance thereon, amounts to "inactionable puffery." *Singh*, 918 F.3d at 63; *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 606 (2d Cir. 2024) ("general statements about reputation, integrity, and compliance with ethical norms" are "inactionable puffery"); *see also In re Merrill, Bofa, & Morgan Stanley Spoofing Litig.*, No. 19-CV-6002 (LJL), 2021 WL 827190, at *9 (S.D.N.Y. Mar. 4, 2021) (concluding that the statements that defendants "maintain established procedures that ensure compliance with all applicable laws and regulations" were nonactionable puffery), *aff'd sub nom. Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022).

The Indictment alleges that documents supporting the marketing and sale of the 2021 144A Bond contained "false and misleading assurances about [Adani Green's] anti-bribery practices and policies and its commitment to such principles, purportedly backed by robust internal compliance measures," and statements "tout[ing]" the company's "risk management committee's oversight of anti-corruption and anti-bribery related matters." (Indictment ¶¶ 93, 94; *see also id.* ¶¶ 115, 116 (alleging that Adani Green's 2021 annual reports "falsely stated" that the company "had a 'zero tolerance' policy for bribery and corruption").) Documents accompanying the 2024 144A Bond, and the 2021 and 2023 Syndicate Loans, also allegedly contained similar "false and misleading assurances" about Adani Green's "'corporate governance' and touted 'maintaining transparency and compliance in every aspect of [the company's] operations.'" (*Id.* ¶ 86, 107, 111).

Here, the alleged misrepresentations appear to be so broad as to qualify as inactionable puffery.[39] The alleged representations regarding Adani Green's commitment to "anti-bribery practices and policies and commitment to such principles," (*id.* ¶¶ 93, 94, 111), could be interpreted as "general statements about reputation, integrity, and compliance with ethical norms," *Meta Platforms*, 123 F.4th at 606. The same is true for Appearing Defendants's purported pledges not to take or give bribes. (Indictment ¶¶ 86, 94.) Statements about "robust internal compliance measures" backing Adani Green's anti-bribery policies, including the "risk management committee's oversight of anti-corruption and anti-bribery related matters," (*id.* ¶ 93), also arguably fall into the category of inactionable puffery as generalized compliance statements. *See In re Merrill*, 2021 WL 827190, at *9; *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 135 (S.D.N.Y. 2021) (finding risk statement that the defendant bank had "a comprehensive control framework designed to provide a well-controlled environment to minimize operational risks" was inactionable puffery). Finally, the assurances of a "zero tolerance policy for bribery and corruption" and promises to "cooperate with governmental authorities" in Adani Green's annual reports, (Indictment ¶¶ 115, 116), are nearly identical to the inactionable puffery found in *Boston Retirement Systems*. 2024 WL 4023842, at *3 (concluding that an alleged misrepresentation of a "zero-tolerance approach to corruption" was inactionable).

The Indictment therefore provides sufficient factual support for the Non-Actionable Puffery Rationale to dismiss Counts Two, Three, and Four. The court now determines whether the Rationale is a substantial reason to dismiss these Counts. In conducting this analysis, the court takes seriously that under

---

[39] For the same reasons, the court finds that the statements are not sufficiently material to sustain the wire fraud charges.

Rule 48(a) it is "not free to substitute its judgment for that of the prosecutor," *Poindexter*, 719 F. Supp. at 10, and that "factors [such] as the strength of the case . . . are not readily susceptible to the kind of analysis the courts are competent to undertake," *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Under Rule 48(a), the Non-Actionable Puffery Rationale provides a substantial reason to dismiss Counts Two, Three, and Four because it is conceivable that the anti-bribery language used in the financial documents is so generic and vague that it would raise legal risks to the prosecution. A court could find that the alleged misrepresentations are more akin to statements regarding compliance with general legal obligations than a specific set of criteria on which an investor would reasonably rely in deciding whether to purchase the securities. And the possibility of such a finding undermines the strength of the fraud charges.

For these reasons, the Non-Actionable Puffery Rationale is both supported by sufficient factual information and a substantial reason to dismiss Counts Two, Three, and Four.

### b. FCPA Charges against Non-Appearing Defendants (Count One)

McCotter's "charge-specific" reason to dismiss Count One is that "the FCPA charges must be dismissed because they do not satisfy the Blanche Memorandum." (McCotter Ltr. at 8.) His entire explanation for this reason is as follows:

> [T]he alleged conduct did not involve criminal organizations, did not have any effect on U.S. companies, did not in any way implicate national security, was not egregious, and has been the subject of investigations in India. The alleged "payments" in this case were made by Indian nationals, working for Indian companies, to the Indian government, with no U.S. interests implicated in any way. The FCPA charges here do not plausibly satisfy

any of the bases given in the Blanche Memorandum for FCPA charges worthy of proceeding. Under the Blanche Memorandum, the FCPA charges should have been dismissed a year ago.

(*Id.* at 9.)

As discussed, the Blanche Memorandum reoriented FCPA enforcement by announcing that the Department "shall focus on cases in which individuals have engaged in criminal misconduct." (*Id.*) It also directed prosecutors to consider four "non-exhaustive factors" when evaluating whether to pursue FCPA enforcement actions, including already-pending cases like this one: (1) "total elimination of cartels and transnational criminal organizations [("TCOs")]" ("Factor 1"); (2) "safeguarding fair opportunities for U.S. companies" ("Factor 2"); (3) "advancing U.S. national security" ("Factor 3"); and (4) "prioritizing investigations of serious misconduct" ("Factor 4"). (*Id.* at 2-3.) For each Factor, the Memorandum also provides guidance regarding the Factor's meaning and purpose.

Given that McCotter's explanation does not include specific citations to the Indictment—instead, referring only to "alleged conduct" broadly, (McCotter Ltr. at 9)—the court identifies the specific allegations that could map onto each Factor to evaluate whether there is sufficient factual information for the proffered reason to dismiss the FCPA charges in Count One.

With respect to Factor 1, the "primary" considerations are whether the alleged misconduct: "(1) is associated with the criminal operations of a cartel or TCO; (2) utilizes money launderers or shell companies that engage in money laundering for cartels or TCOs; or (3) is linked to employees of state-owned entities or other foreign officials who have received bribes from cartels or TCOs." (Blanche Mem. at 2.) The allegations in the Indictment provide no indication that cartels or TCOs are implicated in this

case, which supports McCotter's conclusion that the alleged conduct "does not satisfy" Factor 1. (McCotter Ltr. at 9.)

With respect to Factor 2, the Blanche Memorandum identifies two considerations. (Blanche Mem. at 2-3.) The first consideration is the vindication of "U.S. national security and economic prosperity" by protecting markets and the rule of law from individuals and companies that "bribe foreign officials to obtain business," thereby putting "their law-abiding competitors, including U.S. companies, at a serious economic disadvantage." (*Id.* at 2-3.) The Memorandum directs the Department to "vindicate these interests" by prioritizing the "prosecution of conduct that most undermines these principles." (*Id.* at 3.) It specifically states that "by bribing foreign officials to obtain lucrative contracts" foreign actors "skew markets and disadvantage" U.S. companies. (*Id.* at 3 & n.4) The second consideration is "whether the alleged misconduct deprived specific and identifiable U.S. entities of fair access to compete and/or resulted in economic injury to specific and identifiable American companies or individuals." (*Id.* at 3.) Although no specific U.S. company is identified in the Indictment, the Indictment contains allegations of "bribing foreign officials to obtain lucrative contracts." (*Id.*) The Blanche Memorandum states that through this conduct foreign companies necessarily "disadvantage law-abiding U.S. companies." (*Id.*) Therefore, the Indictment appears to undercut McCotter's notion that the alleged conduct had no "effect on U.S. companies." (McCotter Ltr. at 9).

With respect to Factor 3, the Blanche Memorandum directs the Department to focus FCPA enforcement on the "most urgent threats to U.S. national security resulting from the bribery of corrupt foreign officials involving key infrastructure or assets."

(Blanche Mem. at 3.) Relying on President Trump's National Security Strategy from 2017,[40] the Memorandum explains that this is the correct focus for FCPA enforcement because when foreign government corruption occurs "in sectors like defense, intelligence, or critical infrastructure, American national security interests may be harmed." (*Id.*) The 2017 National Security Strategy defines "critical infrastructure" to include "energy and power," names energy "dominance" as a key national security goal, and identifies the promotion of energy exports as among the "priority actions" to "embrace" energy dominance.[41]

The allegations in the Indictment involve the payment of hundreds of millions of dollars in bribes to corrupt Indian officials involving energy and power. Thus, under the Blanche Memorandum, the alleged conduct appears to present an "urgent threat[]" to U.S. national security," (*id.*), undermining McCotter's assertion that the alleged conduct "did not in any way implicate national security," (McCotter Ltr. at 9).

For Factor 4, the Memorandum instructs the Department to focus on "alleged misconduct that bears strong indicia of corrupt intent tied to particular individuals, such as substantial bribe payments, proven and sophisticated efforts to conceal bribe payments, fraudulent conduct in furtherance of the bribery scheme, and efforts to obstruct justice" as compared to "routine business practices" or "de minimis or low-dollar, generally accepted business courtesies." (Blanche Mem. at 3-4.)

---

[40] National Security Strategy of the United States of America (Dec. 2017), https://perma.cc/2ZWY-ZKC6.

[41] *Id.* at 13 (identifying "six key areas," including "energy and power"), 18 (identifying "energy dominance" as a key national security goal), 22-23 (enumerating specific "priority actions" to "embrace energy dominance," including the promotion of energy exports).

A casual reader could be forgiven for mistaking this paragraph of the Blanche Memorandum for a succinct summary of the allegations in the Indictment. Indeed, each bolded clause appears to describe the very conduct alleged in Count One: alleged "**misconduct that bears strong indicia of corrupt intent** [the intent to bribe Indian government officials for lucrative energy contracts] **tied to particular individuals** [Defendants, *not* the corporate entities for which they worked], such as **substantial bribe payments** [in this case, bribe payments totaling hundreds of millions of dollars], **proven and sophisticated efforts to conceal bribe payments, fraudulent conduct in furtherance of the bribery scheme, and efforts to obstruct justice** [allegations so numerous in this case, that they give rise to four separate and distinct Counts]."[42] (*Id.* at 3-4.)

In summary, the current record contradicts McCotter's reasoning, and therefore fails to support his proffered reason to dismiss Count One on the grounds that the FCPA charges "do not plausibly satisfy any of the bases given in the Blanche Memorandum." (McCotter Ltr. at 8-9). This conclusion appears to be further supported by the fact that the Department did not move to dismiss these charges by the Executive Order's 180-day deadline to "take appropriate action" in all existing FCPA cases—including this one. (Blanche Mem. at 1 (quoting Exec. Order § 2).) This fact suggests that either (a) the Department did not meet the deadline to review the FCPA charges set by the President; or

---

[42] McCotter is correct that the Blanche Memorandum directs that, as "part of their considerations, 'FCPA prosecutors should also consider the likelihood (or lack thereof) that an appropriate foreign law enforcement authority is willing and able to investigate and prosecute the same alleged misconduct.'" (McCotter Ltr. at 9 (quoting Blanche Mem. at 4).) For the reasons detailed *supra* Section III.A.1.b, his claim that the alleged conduct "has been the subject of investigations in India," (McCotter Ltr. at 9), is not only without sufficient factual support, but also inaccurate.

(b) consistent with the Executive Order, the Department concluded that the prosecution of the FCPA charges should continue pursuant to the Memorandum, but McCotter—guided by Mr. Giuffra's "team" and acting as the "sole decisionmaker" within the Department—overruled the Department's prior decision. Ultimately, whichever is the case here is irrelevant given that the court has already detailed the lack of factual support for McCotter's stated reason to dismiss Count One—meaning that Rule 48(a)'s procedural requirements are not met.

The court's conclusion does not mean that additional evidence to support this proffered reason to dismiss does not exist. It means only that the factual support that McCotter has provided is not sufficient.

### c. Obstruction Charges against Non-Appearing Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal (Count Five)

McCotter's "charge-specific" reason to dismiss Count Five is that "the [I]ndictment's theory makes little sense." (*Id.*) As support for this basis, McCotter's letter states, in full:

> The [I]ndictment (paragraph 76) alleges that some of the [D]efendants who allegedly committed obstruction also hired extremely expensive law firms to conduct thorough investigations that implicated the most high-profile defendants while downplaying the role of lower-profile individuals. Not exactly the most obvious way to commit obstruction, to say the least.

(*Id.*)

The Indictment alleges that after the U.S. Issuer received requests for information from the SEC in March 2022, Non-Appearing Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal, together with an unidentified co-conspirator

("Co-Conspirator #1"): (1) "made and agreed to make certain selective disclosures in connection with the . . . Government Investigations"; (2) "destroyed and otherwise concealed evidence" including through "the deletion of incriminating electronic materials" in June and August 2022, and their September 30, 2022 "agree[ment] to conceal their agreement to pay [Defendant Gautam Adani] in connection with [the] bribery scheme"—thereby impairing "the Government Investigations"; and (3) "falsely den[ying] their participation in the bribery scheme" to representatives from the FBI, the Department, and the SEC in Brooklyn, New York between March and July 2023. (Indictment ¶¶ 73-78.) According to the Indictment, the charged obstruction scheme affected the "Grand Jury Investigation, the FBI Investigation, and the SEC Investigation." (*Id.* ¶ 135.)

McCotter's failure to address these serious allegations of the obstruction conspiracy is at best insufficient to meet Rule 48(a)'s procedural requirements and at worst misleading. McCotter appears to argue that because the decision to hire a law firm was not an "obvious" way to commit obstruction, the entire charge should be dismissed. (McCotter Ltr. at 9.) He provides no evidence for this straw man argument and completely ignores the actual obstruction allegations in the paragraph—that the Non-Appearing Defendants and Co-Conspirator #1 coordinated the "withhold[ing]" of "key information" from that law firm and, even more audaciously, from federal officials. (Indictment ¶ 76.)

McCotter also fails to address any obstruction allegation in paragraphs 73 through 78 of the Indictment. These allegations detail a scheme involving the U.S. Issuer, Co-Conspirator #1, and Non-Appearing Defendants Cabanes, Saurabh Agarwal, Malhotra, and Rupesh Agarwal. Instead, McCotter focuses on only one aspect of one allegation regarding the scheme: that "[t]o create the false appearance of transparency and good governance, in or about August 2022," these Non-Appearing Defendants, together

with Co-Conspirator #1, "caused the U.S. Issuer's Board of Directors to initiate an internal investigation run by a law firm headquartered in the United States and supervised by a sub-committee of the Board of Directors." (*Id.*)

The court's finding that the record provides insufficient factual support for McCotter's reason to dismiss Count Five does not mean that such information does not exist, but that because no such evidence is before the court, the Department has not yet satisfied Rule 48(a)'s requirements as to this Count.

## B. Dismissal With or Without Prejudice

Having found that the Department has met Rule 48(a)'s procedural and substantive components as to the stated reason to dismiss Counts Two, Three, and Four, the court must determine whether these Counts should be dismissed with or without prejudice.

According to McCotter, dismissal with prejudice is warranted because the request is "unopposed" and demonstrates that "[n]o game is possibly being played," such as a "cat-and-mouse ploy to keep a defendant constantly under indictment." (McCotter Ltr. at 5.)

The Rule 48(a) Motion requests dismissal with prejudice and Appearing Defendants consent to the requested dismissal. Consequently, the record provides no concern for prosecutorial harassment. *See Rinaldi*, 434 U.S. at 29, n.15 (recognizing that a "principal object" of the leave of court requirement is "to protect a defendant against prosecutorial harassment, e.g., charging, dismissing, and recharging, when the [g]overnment moves to dismiss an indictment over the defendant's objection"). Therefore, the court dismisses Counts Two, Three, and Four with prejudice.

## IV. CONCLUSION

As noted throughout this opinion, the irregularities in the decision to dismiss the Indictment are concerning. On the current record, McCotter appears to have eschewed the professional opinions of innumerable officials from various federal offices and replaced them with his singular judgment. The fact that McCotter came to this decision largely in collaboration with defense counsel, and seemingly without input from the FBI and SEC agents who investigated the alleged misconduct, or the attorneys from the Department, SEC, and U.S. Attorney's Office who brought the case, appears to be highly unusual. McCotter's refusal to meet the procedural requirements of Rule 48(a)—even after the court's clear direction to do so—evinces a lack of respect for the Judiciary as a co-equal branch. It also foreclosed a quick and efficient review of the requested dismissal and compelled the bifurcated resolution of the Rule 48(a) Motion.

Taking no position on the ultimate propriety of Mr. Giuffra's repeat attempts to resolve this bribery case with monetary offers, (Giuffra Decl. ¶ 9), the court finds Mr. Giuffra's reliance on the Department's guidelines for the prosecution of business organizations (as in Section 9-28.300 of the Justice Manual) unpersuasive. This case does not involve corporate defendants. It is brought against eight *individuals*. The Department's cases brought against individual defendants are subject to their own guidelines.[43] It is up to the public to decide what effect offers of this kind have on the equal administration of justice and the rule of law. Ultimately, "it is the public's judgment, and not this [c]ourt's, that truly matters." *Adams*, 777 F. Supp. 3d at 237.

---

[43] U.S. Dep't of Just., Just. Manual § 9-28.300 (2018). The Justice Manual also includes specific policies for the prosecution of wire fraud (Count Three), the FCPA (Count One), and obstruction (Count Five). U.S. Dep't of Just., Just. Manual §§ 9-43.100, 9-47.110, 9-69.100 (2018).

＊ ＊ ＊

In sum, for the reasons above, the court GRANTS IN PART the Department's Rule 48(a) Motion to dismiss the Indictment against all Defendants with prejudice. Counts Two, Three, and Four of the Indictment as alleged against Appearing Defendants Gautam Adani, Sagar Adani, and Vneet Jaain are DISMISSED WITH PREJUDICE. [44] However, the court RESERVES JUDGMENT as to the portions of the Motion regarding Counts One and Five as alleged against Non-Appearing Defendants Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal, pending the Department's fulfillment of its Rule 48(a) obligations as to these Counts.

Pursuant to Rule 48(a), the Department is DIRECTED to advise the court of each reason for dismissing Counts One and Five with prejudice as against Non-Appearing Defendants and to provide the court with sufficient factual support for each reason. The Department is ORDERED to do so no later than **August 31, 2026**.

Finally, the court has been told that counsel for Non-Appearing Defendants have "engaged in several meetings" with McCotter, (McCotter Ltr. at 8), and that "[c]ounsel for all defendants consent" to the Rule 48(a) Motion, (Rule 48(a) Mot.). The court requires the direct assurances of Non-Appearing Defendants' consent on the record. Thus, counsel for Non-Appearing Defendants Ranjit Gupta, Cyril Cabanes, Saurabh Agarwal, Deepak Malhotra, and Rupesh Agarwal must advise the court of

---

[44] No one should mistake the court's granting of the Rule 48(a) Motion as to Counts Two, Three, and Four, for the court's agreement with the Department's decision to dismiss these Counts or as expressing any opinion about the merits of the case.

their client's consent by **August 31, 2026**. The Department is DI-RECTED to advise counsel for Non-Appearing Defendants of this obligation.

SO ORDERED.


Dated:    Brooklyn, New York
          August 10, 2026

s/Nicholas G Garaufis

NICHOLAS G. GARAUFIS
United States District Judge
